446 So.2d 177 (1984)
Thomas L. LEMON and Bettye Lemon, et al., Appellants/Cross Appellees,
v.
ASPEN EMERALD LAKES ASSOCIATES, LTD., Appellee/Cross Appellant.
No. 83-312.
District Court of Appeal of Florida, Fifth District.
February 2, 1984.
Rehearing Denied March 2, 1984.
*178 Dennis L. Horton and Richard H. Langley, Clermont, for appellants/cross appellees.
Fred A. Morrison of McLin, Burnsed, Marable & Morrison, Leesburg, for appellee/cross appellant.
John T. Allen, Jr., St. Petersburg, for Amicus Curiae Federation of Mobile Home Owners of Florida, Inc.
COBB, Judge.
This is a contract dispute arising from a class action instituted by the tenants of a mobile home park against the owner, Aspen Emerald Lakes Associates, Ltd. (Aspen), the purchaser of the park from Clermont Emerald Lakes, Inc. Clermont had originally negotiated the rental agreements with the tenants. Aspen then purchased the park from Clermont, financing most of the $2,000,000 purchase price.
The tenants are under several types of leases which, for purposes of this action, are of three classifications: (1) those leases having a paragraph 6 tying any increase in rent to an increase in variable costs, such as utilities, park maintenance, taxes or governmental regulations, with a ten percent cap each year; (2) those leases with a paragraph 6 tying any increase in rent to an increase in variable costs but with no ten percent cap; and (3) those leases having no provisions tying rental increase to an increase in variable costs. All the leases are automatically extended for one year upon the end of each annual term, unless the *179 tenant notifies the landlord of his intention to vacate.
The plaintiffs brought the action after Aspen notified them of a ten percent increase in rent, and a unilateral change in park rules providing a transfer to the tenants of the responsibility for obtaining and paying for water, sewer and garbage services within the City of Clermont. By amended complaint, plaintiffs alleged they understood from oral and written communications with the previous owner, Clermont, that under the leases the landlord was to provide and pay for water, sewer and garbage services. Plaintiffs requested that the court, among other things, permanently enjoin Aspen from installing water meters on the lots and from imposing on tenants the responsibility for water, sewer and garbage services.
Plaintiffs also alleged that under paragraph 6 of the leases, Aspen could only increase rent when its variable costs, such as utilities, park maintenance, government regulations and taxes, increased, and those leases containing a 10% cap were referring to the initial rental amount. Plaintiffs further asserted that the park's previous owner represented to the tenants that the term "existing rules" in the leases meant that the tenants would not be subject to amendments to those rules made after they signed the leases, and any rule changes required tenant approval. Finally, plaintiffs alleged that Aspen trespassed on their lots when it came on them to install water meters.
After a pre-trial conference, at which many issues were disposed of, the lower court conducted a non-jury trial. Following the trial, the court rendered a final judgment which dissolved the temporary injunction and, in summary, held: (1) Aspen could increase the rent based on an increase in variable costs other than utilities, taxes, government regulations and park maintenance; (2) the 10% cap on rental increase pertains to the immediately preceding year's rent and not the initial year's rent; (3) the leases do not require a correlation between variable costs increases and rent increases; (4) Aspen could change existing park rules and tenants would be subject to those changes; (5) Aspen could not give tenants the responsibility for water, sewer and garbage services by rule change, but could do so only by first reducing their rent accordingly; and (6) Aspen did not trespass by entering the lots to install water meters.
Appealing from the judgment, plaintiffs raise twelve issues. On cross-appeal, Aspen challenges the court's ruling that it could not, by rule change, pass on the responsibility of water, sewer and garbage services. By permission of this court, the Federation of Mobile Homeowners of Florida, Inc., filed an amicus curiae brief in this action.[1]
Appellants' first issue is whether the trial court correctly interpreted paragraph 6 of the leases and thereby properly excluded parol evidence to explain its meaning. The plaintiffs below sought to offer parol evidence to interpret the term "variable costs" in paragraph 6 contained in most plaintiffs' leases, and to show that rental increases were intended to correlate with "variable costs" increases. Paragraph 6 of a majority of the leases provides:
The Landlord, in the event of increases in variable costs, such as Utilities, Park Maintenance, Taxes, or Governmental Regulations, may raise the amount of rent, but not to exceed a maximum of Ten Percent (10%) annually by giving the TENANT notice not less than Sixty (60) days prior to the expiration of the current lease term. The increased rental rate shall automatically become a part of the extended Lease unless the TENANT shall advise the LANDLORD in writing Thirty days (30) prior to the expiration of the current term of TENANT'S intention to vacate the premises and not enter into a new term.
*180 The lower court ruled paragraph 6 was unambiguous so as to make parol evidence thereon inadmissible, and denied a proffer as a matter of law. Pertinent to this issue are the following portions of the final judgment:
Issues previously decided at pre-trial conference:
1. No parol evidence was admitted at trial herein as to the meaning of the term "variable costs" as used in the leases between plaintiffs and defendant, that portion of the leases being clear on its face and lacking the ambiguity necessary for admission of parol evidence.
5. The "variable costs" which may be considered by the defendant in formulating rent increases for those residents whose leases contain the requirement that rent increases be tied to variable costs, are not limited to taxes, utilities, park maintenance and governmental regulations, the categories specifically mentioned in those leases, and a listing of such categories in the leases was not for the purpose of limitation but rather the clear intent of the language of the leases is that these four categories be considered as representative examples of the kind of costs which may vary.
Issues decided at trial:
3. Variable costs as that term is used in plaintiffs' leases, increased in the park during the period from May 1, 1981 through April 30, 1982, over that of the previous year of May 1, 1980 to April 30, 1981, and therefore defendant was justified in imposing a 10% rent increase over rental rates of May 1, 1980 to May 30, 1981 on all tenants by its letter of February 11, 1982 to tenants, a copy of which was admitted into evidence as Exhibit J. The Court denies plaintiffs' request for a ruling on what specific cost categories (i.e., interest, depreciation, utilities, etc.) are included under the language of paragraph 6 of the leases for justifying a rent increase.
It is a well-established legal principle that if a written contract is ambiguous so that the intent of the parties cannot be understood from an inspection of the instrument, extrinsic or parol evidence of the subject matter of the contract, of the relation of the parties, and of the circumstances surrounding them when they entered into the contract may be received in order to properly interpret the instrument. Equally well settled is the proposition that parol evidence is inadmissible to contradict, vary, defeat or modify a complete and unambiguous instrument, or to change, add to or subtract from such instrument, or affect its construction. J.M. Montgomery Roofing Co. v. Fred Howland, Inc., 98 So.2d 484 (Fla. 1957); Jacobs v. Parodi, 50 Fla. 541, 39 So. 833 (1905).
Plaintiffs argued at trial that the purpose of paragraph 6 is to limit rental increases. This contention has merit in view of the public policy concerns which the Florida Supreme Court articulated in Stewart v. Green, 300 So.2d 889 (Fla. 1974), and Palm Beach Mobile Homes, Inc. v. Strong, 300 So.2d 881 (Fla. 1974).[2] Aspen, *181 on the other hand, contended that such an interpretation would make owning a mobile home park an undesirable business proposition. It emphasized that it financed the purchase of the park by taking out a mortgage in a greater amount than that of the previous owner, that its interest rates were higher and that accounting and legal fees incurred in operating the park had also increased. Aspen maintained these expenses constituted "variable costs" and could be passed on to the tenants through rent increases.
The lower court, while determining the term "variable costs" was unambiguous, refused to determine what specific costs fell under that term. Apparently, however, the lower court interpreted the term "variable costs" as any costs which fluctuate. Under the doctrine of ejusdem generis, we do not believe that costs incurred by Aspen in the purchase of the park (interest, attorney fees, etc.) can be equated with costs to operate the park. As we construe the term, it is not ambiguous, although our construction is at variance with that of the trial court. Since the court's determination in regard to the rental increase was based upon its erroneous construction of the term, reversal and remand for reconsideration without regard to purchase costs is necessary.
Next, the plaintiffs contend the lower court erred by not interpreting paragraph 6 as requiring a dollar-for-dollar correlation between variable cost increases and rental increases or, in the alternative, by not allowing parol evidence on the matter. The final judgment provides, in pertinent part:
6(f). Exhibits A, B, C, D and H require, as a prerequisite to any rent increase, that variable costs increase during the prior year. However, none of these leases require a correlation between the amount of such cost increases and the amount of a resulting rent increase. Instead, any increase in variable costs will allow a rent increase up to the full 10% allowed under Exhibits C, D, E and H and an increase in rent under Exhibits A and B of any amount, so long as such increases do not violate the standards of good faith and unconscionability imposed by Chapter 83, Florida Statutes, under the particular facts of such increases... .
8. As to the issues of correlation between cost increases and rent increases addressed in paragraph 6(f) above, and the application of the 10% rent cap in Exhibits C, D, E and H also addressed in *182 paragraph 6(f), the leases are clear and unambiguous, and no parol evidence will be admitted on this point.
Paragraph 6, in relevant part, reads:
The Landlord in the event of increases in variable costs, such as Utilities, Park Maintenance, Taxes or Government Regulations may raise the amount of rent but not to exceed a maximum of Ten Percent (10%) annually... .
Even accepting the plaintiffs' assertion that the purpose of paragraph 6 is to limit rent increases, a dollar-for-dollar correlation between cost increases and rent increases is not a necessary interpretation in view of section 83.754, Florida Statutes (1981), which gives tenants a remedy for unconscionable lease agreements.[3] Moreover, to construe paragraph 6 of the contract as requiring a dollar-for-dollar correlation between cost increases and rent increases in effect would rewrite the contract. It also would be logically inconsistent with the 10% cap. Therefore, we hold that the trial court was correct on this point.
The plaintiffs' final point under paragraph 6 of the lease is whether the lower court erred by interpreting the provision to mean that the 10% cap was based on the prior year's rent, rather than on the initial rent when the parties executed the leases. (The court held that only variable cost increases occurring during the immediately preceding lease term could be considered in formulating rent for the next renewal period.) The final judgment provides in relevant part: "... [N]o annual rent increase shall exceed 10% of the prior year's rent... ."
The leases are for a one-year term with the right to renew thereafter for an additional year. Under paragraph 6, the rent increase automatically becomes a part of the extended lease. Nothing indicates the initial rent is to be the reference for the 10% cap and the parties' intention to limit rental increases is satisfied by that 10% cap. Thus, the lower court was justified in determining without the use of parol evidence that the 10% cap was to be based on the preceding year's rent, and not the rent charged when the leases were initially executed.
The second issue on appeal, which is also the subject of the cross appeal, is whether the trial court erred in holding that Aspen could not pass on water, sewer and garbage charges to the tenants by rule change but could do so only by reducing the tenants' rent by the minimum charge imposed by the City of Clermont for the services.
In the final judgment, the lower court decided the matter as follows:
2. Defendant cannot pass on the charges for water, sewer and garbage services, and require each resident to contract directly with the city for these services, by mobile home park rule change as defendant attempted, since no provision for direct payment of those charges by residents to the city is made in plaintiffs' leases and section 83.760(3) requires all financial obligations of tenants to be contained in the lease.
3. Although defendant may not pass on the costs of water, sewer and garbage services by rule change as attempted, defendant may shift the cost of these services and the responsibility for contracting for them to plaintiffs if the adjustments *183 in rent set forth hereinafter are made, so as to compensate plaintiffs for removal of these services from the rent they pay under their leases.
Relevant to this issue are the following statutory provisions:
Section 83.760(3), Florida Statutes (1981): Only such park rules or regulations as are reasonable under the circumstances and specifically incorporated by reference in the written leases shall be enforceable. The lease shall contain a provision that Part III of chapter 83 governs mobile home park tenancies. The lease shall contain the amount of the rent, any security deposit, installation charges, fees, assessments, and any other financial obligations of the mobile home owner. However, this provision shall not be construed to prevent any mobile home park owner from passing on to the mobile home owner any costs, including increased costs for utilities, which are incurred due to the actions of any state or local government. (Emphasis added.)
Section 83.764(3)(a), Florida Statutes (1981): A mobile home park owner or operator shall be required to disclose fully in writing all fees, charges, assessments, and rules and regulations prior to a mobile home dweller's assuming occupancy in the park. No fees, charges or assessments so disclosed may be increased, or rules and regulations changed, by the park owner or operator without specifying the date of implementation of said fees, charges, assessments, or rules and regulations which date shall be no less than thirty days after written notice to all mobile home owners.
Section 83.764(4), Florida Statutes (1981): Failure on the part of the mobile home park owner or operator to disclose fully all fees, charges, or assessments shall prevent the park owner or operator from collecting said fees, charges, or assessments, and refusal by the dweller to pay any undisclosed charges shall not be used by the park owner or operator as a cause for eviction in any court of law.
Pursuant to the rules and regulations under which the park has operated from 1975 the landlord is to supply water, sewer and garbage services to the tenants. The rules and regulations also provide that the landlord can, subject only to tenant notice, amend the rules and regulations.
The plaintiffs argue that the water, sewer and garbage charges were not disclosed in their leases as required by section 83.760(3), Florida Statutes (1981) and, therefore, under section 83.764(4), Florida Statutes (1981), Aspen cannot impose these expenses on them. Aspen agrees with plaintiffs that the lower court erred by holding it could pass on these costs without rule change if it decreased the rent accordingly. However, Aspen maintains that it can, by park rule change, pass on to plaintiffs the responsibility for and cost of obtaining water, sewer and garbage services without a rent adjustment.
The plaintiffs' leases incorporate by reference the park rules and regulations. Therefore, Aspen argues, the rules and regulations are part of the leases, and the tenants should have been aware when they signed the leases that the landlord could change the rules and regulations,[4] which meant that the landlord could also change the rule pertaining to responsibility for water, sewer and garbage services. Aspen maintains it satisfied section 83.760(3)'s requirement of disclosure. The plaintiffs counter that the effect of Aspen's action is to unilaterally modify the lease.
We hold that section 83.760(3), Florida Statutes (1981), prohibits Aspen from passing on these charges to the tenants even *184 with a rent reduction. To allow this to be done by rule change would constitute a unilateral amendment to a bilateral lease. Any increase in the costs of these utilities, as clearly shown by paragraph 6 of the leases, may be considered and computed by Aspen in regard to its right to increase rents in a subsequent year. But the amount of rent must be contained in the lease; it is a factor separate and apart from park rules and regulations.
In their third point on appeal, the appellants argue that, since the trial court declined to define what the term "variable costs" included, it could not properly determine that they had increased. Appellants also argue, and we agree, that the trial court should not have considered such items as mortgage interest, depreciation, amortization, legal fees, and closing costs in this computation. We therefore hold that the trial court ruled on an apparently improper basis that there was an increase in the owner's costs during the period from May 1, 1981 through April 30, 1982, and that the trial court improperly considered certain purchase costs in regard to the meaning of the term "variable costs."
We have considered points four through twelve raised by the appellants and find them to be either without merit or moot by reason of the preceding opinion.
AFFIRMED IN PART, REVERSED IN PART and REMANDED for reconsideration consistent with this opinion.
DAUKSCH and COWART, JJ., concur.
NOTES
[1] The Federation of Mobile Home Owners of Florida, Inc., is a statewide organization, representing Florida mobile home owners.
[2] This court is mindful of the relationship between a mobile home park owner and a mobile home owner under Florida law. In 1981, the Florida Legislature enacted the Florida Mobile Home Landlord and Tenant Act, Part III of Chapter 83, which in some respects is a mobile home park tenant's bill of rights. Prior to this act, similar legislation existed to a limited extent. Two Florida Supreme Court cases discuss the legal relationship between tenants and owners of mobile home parks: Palm Beach Mobile Homes, Inc. v. Strong, 300 So.2d 881 (Fla. 1974), and Stewart v. Green, 300 So.2d 889 (Fla. 1974).

In Palm Beach Mobile Homes, the plaintiff purchased a trailer from Dolan Corp. and then rented a lot from Dolan, paying $600 for one year's rent. Thereafter, the legislature enacted a statute which provided grounds for eviction from mobile home parks. The next year, the plaintiff tendered a $600 check but Dolan declined to accept it and refused to renew her lease. The plaintiff sued and Dolan argued that the statute was unconstitutional as it interfered with property and contract rights. The lower court held the statute was constitutional. Affirming, the Supreme Court acknowledged Dolan's property rights but determined the legislature was justified in imposing reasonable regulations on mobile home parks in light of the peculiar nature of and problems presented by mobile homes. The court stated:
Mobile homes come to rest in established parks, the wheels are generally removed, they are anchored to the ground, because of forces of the wind, connections with electricity, water and sewerage are made, awnings are frequently attached, and to a large degree they lose their mobility except, unless, and until the wheels are restored, disruption of electrical, water and sewer connections is had and a certain amount of dismantling and crating is had, all at a substantial expense of the owner of the mobile home who had bought such home with the expectation of being able to remain in the park for a not unreasonable time so long as he abides by all the reasonable regulations established by the park owner. The removal from one park to another becomes more than a mere hitching to a truck or tractor and pulling it away. To a large degree, mobile homes are occupied by people in the lower income brackets who cannot spend several hundred dollars at the mere whim of a lessor park.
Id. at 886.
In Stewart v. Green, the court affirmatively answered a certified question of whether the statute setting out the grounds for mobile home park eviction was constitutional. The court stated:
If mobile home park owners are allowed unregulated and uncontrolled power to evict mobile home tenants, a form of economic servitude ensues rendering tenants subject to oppressive treatment in their relations with park owners and the latters' overriding economic advantage over tenants.
Regulatory laws that apply to the old tin-can tourists and their easily movable trailers and even those applicable nowadays to rental apartments are inadequate for the regulation of mobile homes under conditions prevailing today. The Legislature finally recognized ... that a hybrid type of property relationship exists between the mobile home owner and the park owner and that the relationship is not simply one of landowner and tenant. Each has basic property rights which must reciprocally accommodate and harmonize. Separate and distinct mobile home laws are necessary to define the relationships and protect the interests of the persons involved.
Id. at 892.
[3] Section 83.754, Florida Statutes (1981), states:

Unconscionable lot rental agreements. 
(1) If the court as a matter of law finds a mobile home lot rental agreement, or any provision of the rental agreement, to have been unconscionable at the time it was made, the court may:
(a) Refuse to enforce the rental agreement.
(b) Enforce the remainder of the rental agreement without the unconscionable provision.
(c) So limit the application of any unconscionable provision as to avoid any unconscionable result.
(2) When it is claimed or appears to the court that the rental agreement, or any provision thereof, may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to meaning, relationship of the parties, purpose, and other relevant factors to aid the court in making the determination.
[4] Section 83.764(3)(a), Florida Statutes (1981), allows for unilateral modification of the rules and regulations. In fact, a bill proposed during the 1974 Florida Legislative Session sought to require majority tenant approval before an amendment to park rules could become effective. However, the tenants' approval language was deleted from the final version of the bill which became law. Note, Mobile Home Park Practices: The Legal Relationship Between Mobile Home Park Owners and Tenants Who Own Mobile Homes, 3 Fla.State Law Rev. 103, 119 (1975).