## GEHMAN, et al. v GRAVIS, et al.
### Case No. 84-1008CA
Twentieth Judicial Circuit, Lee County
January 8, 1990

## OPINION OF THE COURT

JAMES R. THOMPSON, Circuit Judge.

### *PARTIAL FINAL JUDGMENT*

THIS ACTION was tried before the Court on the claims of plaintiff, Edwin V. Hagen. On the evidence presented the Court denies all claims except that for the water and sewer charges for 1984. It is therefore

ADJUDGED that plaintiff, Edwin V. Hagen, recover from defendant, R.Harold Graviss, the sum of $185.52 that shall bear interest at the rate of 12% per annum and for which let execution issue. It is further

ADJUDGED that plaintiff, Edwin V. Hagen, recover from defendant, The National Trust Company, as trustee for trust number 5238,

the sum of $112.53, that shall bear interest at the rate of 12% per annum and for which let execution issue. It is further

ADJUDGED that the Court shall reserve jurisdiction for purposes of assessing costs and determining all issues relevant to attorneys' fees and assessments, for the purpose of hearing the claims of the other plaintiffs and for all other matters necessary to a final resolution of this cause.

DONE AND ORDERED in Fort Myers, Lee County, Florida, this 8th day of January, 1990.

## EXPLANATION OF PARTIAL FINAL JUDGMENT

The principal issue presented by this case, whether the rents being charged for the lots in a mobile home park are unconscionable, is complex, the statutory and the decisional law is evolving and the existing precedent may not have fully addressed the more subtle aspects of the issue. The court, although confident that it has resolved the matter correctly under existing law, recognizes both the increased possibility of error and the likelihood of the further evolution of the law under such circumstances; therefore, to facilitate review, should either party seek it, the facts of the case and the reasons for the result are set forth in some detail.

## FINDINGS OF FACT

1. This action was originally filed March 7, 1984 and tried on the claims in the Third Amended Complaint filed May 30, 1986 and the Supplemental Complaint filed July 21, 1987. Count I is a claim that the rents charged by the defendant owners of the mobile home park are unconscionable in violation of Section 723.033, Florida Statutes (1984 Supp.) and its predecessors and request a broad spectrum of relief. At trial the period for which this issue was litigated was for the rents beginning January 1, 1983 through trial (September 1987). Count II is a claim for improper and illegal assessments in violation of Section 723.041(1)(b) Florida Statutes (1984 Supp), (formerly Fla. Stat. 83.764(3) & (4). Count III is a claim for Declaratory Relief requesting the court to determine the rights and obligations of the parties as "to water and sewer charges, unconscionability and the rights and obligations of the owner". Count IV is a claim for damages. This action was originally begun as a class action; however, as a result of the rulings of this court, it was ultimately replied to name approximately 350 of the park residents as individual plaintiffs. As a result of perceived problems with this the cases of all plaintiffs, except Mr. Edwin Hagens, were severed and the action was tried only to his claims. Mr. Hagens is

president of the homeowner's association. Appellate Court decisions rendered, subsequent to the trial of this case, have resolved these procedural problems in a manner favorable to the plaintiff. See *Lanca Home Owners, Inc. v Lantana Cascade of Palm Beach Ltd.* 13 FLW 568 (9/23/88); *B. J. Pearce v Doral Mobile Home Villas, Inc.* 521 So.2d 282 (Fla. 2d DCA 1988). Therefore, if the parties wish to do so, they may apply to have the Court consider whether the Partial Final Judgment should, with modifications, be entered as the Final Judgment in the case.

2. Poinsettia Manufactured Home Rental Park ("the Park") is a typical mobile home park. It opened for the sale of mobile homes and the leasing of spaces in 1972 and reached full occupancy in 1983. It has 322 developed spaces of an average size of 48' by 89'.

3. The park was owned by defendant R. Harold Gravis from December, 1978 when he purchased it from the Elan Corp. for $1,100,000 until September 19, 1984 when it was sold effective that date to defendant, The National Trust Company, as trustee for Trust Number 5238 for $4,100,000.

4. Mr. Hagens purchased a mobile home from the park owner and moved into the park in September, 1979. He was first offered a lease in October, 1979, approximately one month after his occupancy. He signed yearly leases for 1980, 1981, 1982 and 1983, but has chosen not to sign the leases offered for 1984 to date.

5. Water and sewer service was originally provided to Mr. Hagens by the park owner as part of the rent. He paid a monthly rental charge for his lot and there was no separate charge for water and sewer. Mr. Hagens, understood this arrangement prior to his moving into the Park; however, it was never specifically disclosed to him, prior to his moving in, that there would ever be a separate charge for water and sewer or that it would not continue to be provided by the owner in return for the monthly rental. These circumstances are the same for the other parties entering the Park prior to October 1983. In November and december of 1983 Mr. Graviss paid for and had installed individual water meters (total cost roughly $150,000) and effective January 1, 1984 the City billed Mr. Hagens and the other tenants directly for their water and sewer services. This was done in lieu of a rent increase for 1984, there was no rent reduction, it was done without the consent of the residents and the effect was to transfer this charge directly to the residents. Mr. Hagens additionally paid a $35 deposit to the City for this service and a $15 turn on charge. If the bills for the service are not paid the City will turn off the water. He is a full time resident of the park and testified his bills have since

128

averaged $17.60 a month. PX #30 which consist of the actual bills reflects a slightly different figure; for 1984, a total of $178.15 (math on exhibit corrected), plus $35 deposit, plus $15 turn on charge; for 1985 a total of $194.22; for 1986 a total of $182.06; for the seven months shown in 1987 a total of $93.63. The actual monthly figures become significant in later analysis; therefore, they are computed as follows. The $35 deposit is still Mr. Hagens. What should be factored in is the loss of its use while it is held by the City. The court applies the legal rate of interest, 12%, to the $35 to give a yearly factor of $4.20. Therefore, for 1984 the average monthly charge is ($178.15+ $15+ $4.20)/12 months or $16.45 a month. For 1985 the average monthly charge is ($194.22+ $4.20)/12 months or $16.54 a month. For 1986 the average monthly charge is ($182.06+ $4.20)/12 months or $15.52 a month. For 1987 ($93.63+ $2.45)/7 months or $13.73 a month. It is also noteworthy that a part time resident, apparently a significant number, see paragraph 4a of the supplemental complaint, will probably have his cost increased by a lessor amount as his usage will be lower over the year.

6. The water and sewer charge is not address in the park rules either before or after the change. The leases offered before the change contain wording protecting the owner from "increases in the utility rates (for utilities furnished by the LANDLORD)", see for example PX #24, the 1983 lease, and which by implication, if not more directly, obligate the landlord/owner to provide these services. The leases offered beginning January 1, 1984 provide that the tenant shall pay water and sewer charges etc. See for example PX #18, 1984 lease. The tenants received formal notice of this lease and the lease itself by mailing dated October 27, 1983. PX #18.

7. Prior to April, 1983, each tenant with a washing machine on the premises paid an extra $2 per month water charge. In April, 1983, this extra charge was removed by combining it in the basic rent.

8. Prior to April, 1983, each tenant with cable television paid his own basic monthly service charge of $5. In April, 1983, the Park assumed the basic monthly service. The tenant remains responsible for installation and hookup and any charges in excess of the basic monthly service.

9. The monthly lot rental charges at Poinsettia for the years in issue and for a select number of other years are as follows:

| Lot | 1973 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|---|---|---|
| Standard | $55 | $70 | $77 | $87 | $105 | $135 | $135 | $145 | $155 | $165 |
| Corner | $60 | $75 | $82 | $92 | $110 | $140 | $140 | $150 | $160 | $170 |
| Hagens | n/a | $87 | $94 | $104 | $117 | $140 | $140 | $150 | $160 | $170 |
| Hagens* | n/a | $87 | $94 | $104 | $117 | $140 | $156.45 | $166.54 | $175.52 | $183.73 |

*Note - line not adjusted by year due to monetary changes w/W&S added to rent after 1983.

Mr. Hagens has a corner lot and paid the extra $2 per month water charge and the extra $5 per month CTV charge prior to April 1983.

9. Explanations for rental increases.

a) 1982 - $18 a month increase. No particular formula was used.

b) 1983 - $30 a month increased. Mentioned - water up 351% over preceding year, power and insurance up and taxes up dramatically as a result of reassessment. PX #22.

c) 1984 - No rent increase as such; however, the effect of the park owner shifting the cost of water and sewer to the tenant increased Mr. Hagen's cost by $16.45 per month for that year.

d) 1985 - $10 a month increase. At time of sale of park. Selling owner did not recall if increase based on cost of living or something else. Purchasing owner testified he recommended the increased based on his market study of the rents in the area.

e) 1986 - $10 increase. The Notice of Rent Increase, which is part of NT #6, lists the reasons as "The new owner's initial financial investment in the park, interest charges for financing the purchase of the PARK and the increase in the property taxes for 1985. NT #5, which is a different version of the same document, list "owner's initial financial investment and the loans or interest charges pertaining to same, prevailing economic conditions as set forth in subparagraph (b) on pages 9 and 10 of the . . . prospectus . . . and operating cost."

10. The relationship of the park owner and the tenants, including Mr. Hagen, after the tenants' mobile home has been affixed to the land and after the initial rental agreement is such that the tenant has no meaningful choice but to accept the terms of the subsequent lease agreements. The tenant does not have the option of moving the mobile home because there are no mobile home parks in Lee County accepting used mobile homes and if either a lot in a park or a parcel of land unconnected with a park could be located, he would have the considerable expense and burden of moving the mobile home and the loss in value occasioned by the damages to it that would result from its being moved. The testimony places the expense at roughly between $10,000 and $15,000. The option of selling is also not meaningful because, assuming the normal operation of the market, the more burdensome lease provisions would diminish the price the buyer would be willing to pay and thereby indirectly require the selling tenant to bear the burden of the provisions he is seeking to avoid.

11. The expert testimony presented on the issue of unconscionability is, in summary, as follows.

130

a) Thomas D. Curtis, Ph.D., Professor of Economics. For the Plaintiffs. His reports are PX #3 and #4. Dr. Curtis approached the issue primarily by a CPI (Consumer Price Index) analysis supplemented by some consideration of rents and amenities in other parks. He chose 1979, after the inflationary 70's, as the base year and the $17.60, which Mr. Hagen testified was his average monthly water and sewer bill, was treated as a rent increase in that amount when the park owner discontinued providing the water and sewer as part of the rent without an equal reduction in the rent. His analysis is as follows:

| Date | Rent | W&S | Eff. Rent | Rent Change | CPI Rent | Percent Change | Difference CPI Rent & Eff. |
|------|------|-----|-----------|-------------|----------|----------------|----------------------------|
| 79 | $70 | -0- | $70 | — | $70 · | — | — |
| 80 | $82 | -0- | $82 | $12 | $79.75 | 16.7% | $2.25 |
| 81 | $92 | -0- | $92 | $10 | $89.09 | 12.2 | $2.91 |
| 82 | $105 | -0- | $105 | $13 | $96.62 | 14.1 | $8.38 |
| 83 | $135 | -0- | $135 | $30 | $100.24 | 28.5 | $34.76 |
| 84 | $135 | $17.60 | $152.60 | $17.60 | $104.38 | 13.0 | $48.22 |
| 85 | $145 | $17.60 | $162.60 | $10 | $108.11 | 6.6 | $54.49 |
| 86 | $155 | $17.60 | $172.60 | $10 | $112.13 | 6.2 | $60.29 |
| 87 | $165 | $17.60 | $182.60 | $10 | $113.92 | 5.8 | $68.86 |

He is of the opinion that there are a number of parks in Lee County charging unconscionable rents and that with respect to this park the rents became unconscionable in 1983 and that they are unconscionable by the amount of the different between the CPI rent and the Effective rent for 1983 and each year thereafter.

b) W. Michael Maxwell, real estate appraiser, MAI, SRPA. (for defendant Graviss). (Report Def. - Graviss Exh. #8). Mr. Maxwell approached te issue by attempting to determine the fair market rental for a lot in Poinsettia in the traditional manner of the real estate appraiser by determining what current rentals are being paid for comparable properties with adjustments being made to the actual rents charged for other properties to account for the difference in the properties. In his opinion the market rent for the Park for the years encompassed by his study is as follows:

| | 1983 | 1984 | 1985 |
|-------------------------------------|------|------|------|
| Market rent for a lot in Poinsettia Park Standard lot | $125 | $135 | $145 |

Corner or lakeview lots are typically charged $5 to $15 extra. This estimate of market rent is based on water/sewer charges being paid separately by the tenant.

In Mr. Maxwell's opinion the rents are not unconscionable for the years of his study. Mr. Maxwell also opined that if a CPI analysis were

**131**

used with the base year of 1973, which will then include the years of high inflation, and the beginning rental in the park of $55 it would produce a rental of $131.45 for 1984.

c) William P. Pardue, Real Estate Appraisers, MAI, SRPA, CRE. (for defendant National Trust). (NTX #15 and #17). Mr. Pardue approached the issue, as did Mr. Maxwell, and reached an opinion as to the market rent for the Park as of January 1, 1983, January 1, 1985 and January 1, 1987. His opinion is as follows:

| Fair market rental for the Park | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|
| Standard lot | $131 | | $142 | | $165 |
| Corner lot | $136 | | $147 | | $170 |

This estimate of market rent is also based on the water/sewer charges being paid separately by the tenant.

In Mr. Pardue's opinion the rents are not unconscionable for the years of his study. He further offered the observation that no park in Lee County charges rent at or around the amount suggested as conscionable by Dr. Curtis. Mr. Pardue also offered an analysis, NT #17, comparing the cost of renting with the cost of purchasing a mobile home lot and which purported to indicate the rents charged were in the appropriate relationship to the cost of purchasing. The Court did not attach as much weight to this as others with more understanding might because the 10% return on investment that was used seemed somewhat inflated to favor the result and the bait and switch type of selling practiced for mobile home lot lessees discussed in finding of fact #17 seemed to make reliance on such a comparison less appropriate.

The court would note for the parties that these experts opinions as to what constitutes legal unconscionability, as opposed to what might constitute market rent or a CPI based rent, is not particularly helpful. For the Plaintiffs expert it simply means a rent grossly in excess of his CPI analysis and for the Defendants' experts it simply means something grossly in excess of comparable or market rent. Their opinions do not and probably can not really come to grips with the ultimate issue because the legal component of the analysis is not present and of course, unconscionability is a question of law.

12. In 1983 approximately 56 lots were leased to new residents of the park who purchased mobile homes, had them set up in the park in that year and apparently accepted the leases with the terms, conditions and rental rates in effect for that year. N.T. #13. Although there is no evidence of whether these new residents received any special incentives, it appears these were free market transactions with the residents being

132

under no particular compulsion to purchase the mobile home and accept the terms of these leases.

13. After January 1, 1984, when the cost of the water/sewer service was transferred to the tenants, approximately 81 existing affixed mobile homes were purchased by new residents and leases for their associated lots entered into. N.T. #14. It cannot be determined from evidence what effect, if any, the terms of the leases had on the purchase price of the homes. (Caveat: the court's notes, either because of the lack of evidence presented or because of the failure of the court to note it, are incomplete with respect to N.T. Exhs #13 and 14; however, because the park became filled in 1983, it is believed that the new residents in 1983 purchased from the park owner and the new residents after 1983 purchased from an existing tenant.)

14. The prospectus for the Park, required by Fla. Stat. 723.011, contains, as required by Fla. Stat. 723.012(9), an explanation of the manner in which rents and other charges will be raised. Court's Exhs. #1 and #2. This document was apparently prepared and filed in 1984 or 1985 and set forth the rent beginning January 1, 1985 and the manner in which the rent and other charges were to be increased thereafter. The factors to be considered in increasing rents are as extensive as a fine legal mind can devise and include the CPI. Court's Exh. #2, page 9. The use of variables so far ranging as to be meaningless is apparently not an uncommon practice. See for example *Village Park v State, Sept. of Business*, 506 So.2d 426 (Fla. 1st DCA 1987) at 431.

15. The directors of the Home Owners Association of the Park and the owner negotiated the terms of the lease for 1986. By majority vote the tenants approved it and the Association, on behalf of the residents, executed a written agreement October 31, 1985 agreeing to accept the form of the lease and a $10 rent increase for 1986. NT #1. The document signed by the president of the association indicates the residents accepted. Mr. Hagen contends this agreement was only to settle the increase and not to settle whether the total amount had been or continued to be unconscionable. He also contends he personally voted against the agreement and is not bound by it. The Defendants contend that the residents have accepted the rent for 1986, foreclosing any claim that the rents for 1986 are unconscionable and providing a base to measure conscionability of rents for near years.

16. Condition of the Park and amenities. The size of the club house, the condition of the streets and other amenity and maintenance matters have been considered as they affect the issue of the unconscionability of

the rents; however, the court finds nothing in the condition of these matters that would or could form the basis for any legal relief that is separate and apart from the claim of unconscionable rent. In other words they are legally sufficient to preclude any court ordered changes or other similar relief.

17. The relationship between owner and tenant in a mobile home park setting is, as disclosed by the evidence in this case, unique and certain additional aspects need to be considered in determining the issues presented in this case. They are found to be as follows.

Neither rentals in unfilled parks or rentals in filled parks provide a reliable standard to determine by comparison what rent is unconscionable in a filled park. The unfilled parks are not comparable. They have mobile home sales operations associated with them and generally require that the mobile home be purchased from them in order to lease a lot. One of the principal and most effective incentives offered in the sale of mobile homes is low lot rentals. The lot rents are lower than might be warranted because the business/park owner is in effect subsidizing the rent in order to profit on the sale of the mobile homes and to expedite the filling of the park. When the park is filled and the tenants committed to the park the sales part of the business is ended and the rents are increased without fear that the tenant will leave. Indeed the process is much, though not completely akin to the bait and switch tactics prohibited in certain consumer transactions. The bait being the initial low rent while the park is filling that attracts the tenant to the park and the switch being the increased rentals after the park has filled which the owner has anticipated all along but does not disclose. Potential for abuse, of course, as counsel has pointed out, does not mean abuse has occurred. On the other hand, the rentals charged in other filled parks are not a reliable standard by which to determine conscionability because they are not established by free market forces. They are determined by park owners who already have their tenants committed to the lots and not free to leave. The principal means of setting rents in this case was the use of the so called market study. Such a study apparently consists simply of looking at and considering the rents charged in similar unfilled parks when a park is filling and similar filled parks when the park is full. The effect of such practice is to keep the rents low when the park is filling and the owners must meet the competition to fill their parks, sell their mobile homes and keep the rents high when the parks are filled and the tenants are committed and the owners are motivated to maximize the return on their investment. The marketing practice of providing low lot rental to encourage mobile home purchases and to aid in filling parks will

134

virtually guarantee that residents of older filled parks will be paying more fo less than residents in newer and more modern filling parks and will insure ongoing dissatisfaction among mobile home residents.

A mobile home park is valued primarily by reference to its income producing capacity and, therefore, a modest increase in the rent for each lot will significantly increase the park value. The ability to profit from the appreciated value and to create it by raising the rents of tenants who are not free to leave is, of course, one of the prime incentives in developing a park. However, sale at profit creates greater debt service which must be funded, increased valuation for taxes which must be funded and ever greater investment expectations, all of which cause rents to spiral ever upward. The rate of increase will, of course, be greater after the park is filled and there is little incentive left to keep rents lot. This circumstances also calls into question any standard for unconscionability that must rely on comparisons with rents in filled parks.

## CONCLUSIONS OF LAW

### UNCONSCIONABILITY

The first and principal issue presented by this case is whether the lot rentals for any of the year 1983 through 1987 are unconscionable. Under the Common Law and Fla. Stat. 723.033 (1984 Supp.) the Court has the authority to determine if any provision of the mobile home rental agreement was unconscionable at the time it was made and, if so, either refuse to enforce the rental agreement, enforce the remainder the rental agreement, without the unconscionable provision, or limit the application of the unconscionable provision so as to avoid any unconscionable result. The legal concept of unconscionability, as it has development, is extremely elusive. Unconscionability is a question of law; however, there is very little to guide a Court attempting to determine if a particular contractual provision is, in fact, unconscionable. The unique relationship of a mobile home park owner and his tenant and the marketing practices in this type of business compound the difficulty. Virtually all of the decisional precedents indicate that while it is only a guide and not a rule of law, the common approach to the issue is to look for the presence of each of two separate circumstances. The first is procedural unconscionability, which is the absence of meaningful choice on the part of the aggrieved party to the agreement. The second is substantive unconscionability, which is contract terms that are unreasonably favorable to the other party. The principal cases establishing this proposition, which this Court considers most important to this case, are *Kohl v Bay Colony Club Condo., Inc.,*

398 So.2d 865 (Fla. 4th DCA), petition for review denied, 408 So.2d 1094 (Fla. 1981), *Bennett v Behring Corp.,* 466 F. Supp. 689 (S.D. Fla. 1979), *Steinhardt v Rudolph,* 422 So.2d 884 (Fla. 3d DCA 1982), *B. J. Pearce v Doral Mobile Home Villas, Inc.,* 521 So.2d 282 (Fla. 2d DCA 1988), *Appel v Scott,* 479 So.2d 800 (Fla. 2d DCA 1985). In the circumstances of the relationship between a mobile home park owner and his tenants, with respect to rental increased imposed after the mobile home has been set on the lot, procedural unconscionability is present virtually as a matter of law. See *Lanca Home Owners, Inc. v Lantana Cascade of Palm Beach Ltd.,* 13 FLW 568 (1/23/88), *B. J. Pearce v Doral Mobile Home Villas, Inc.,* 521 So.2d 282 (Fla. 2d DCA 1988). The court has found that the tenants in this case had no meaningful choice when faced with these rental increases and the procedural unconscionability prong of analysis is obvious and requires no additional discussion. The resolution of this issue, therefore, turns on whether the term of the agreement requiring the rents in issue is substantively unconscionable. Although the law, as it presently exists, may later be determined to be inadequate to deal with the mobile home lot rental situation, virtually all of the existing precedents that have dealt with the substantive unconscionability question have considered the prime indicia of substantive unconscionability in these circumstances to be whether the price being paid by an aggrieved party *is significantly* higher than that being paid by other similarly situated consumers in similar transactions for similar facilities. *Bennett v Behring Corp.,* supra, at 698; *B. J. Pearce v Doral Mobile Home Villas, Inc.,* supra; *Garrett v Janiewski* 480 So.2d 1325 (Fla. 4th DCA 1985). See also *Ashling Enterprises, Inc. v Browning,* 487 So.2d 56 (Fla. 3d DCA 1986), sustaining a finding of unconscionability in reliance on comparable parks. However, the use of a comparable rent analysis to determine unconscionability in this situation is obviously questionable because the most comparable rents for a filled park will primarily be with those for other filled parks and, therefore the standard of comparison will be those rents that have not been determined by free market forces. However, a CPI analysis has its own weakness. It has not support in the precedent and if, as is usually the case, it begins with a base year when the park is filling, it will begin with a rent that is artificially low for the reasons mentioned and carry it forward to produce an artificially low rent in the future and one that because of earlier park owner expectation not support the park. It is at least arguable whether a tenant who had the benefit of lower than market rents in the past should acquire the right to have them continued into the future. However, there is a very compelling reason why a CPI analysis has merit. It keeps the rents in line with the

136

reasonable expectations of the purchasers which the owners intending otherwise take no action to correct prior to the tenant becoming committed to the lot. The Court is very mindful that the doctrine of unconscionability has not evolved, nor is it likely to, into a judicially supervised system of rent control for mobile home parks and that it is only the grossest overcharges that will be reached by this doctrine. It is conceivable that a court recognizing a very strong sowing of procedural unconscionability might require a much lesser showing of substantive unconscionability than has heretofore been considered sufficient if there were a clear standard; however, both the wisdom and the legality of approaching a rental control situation in such a fashion is doubtful and under the fact os this case and the standard that the law has weighted most heavily, comparable cost or market rent, the result would be the same. The law requires standards, or at least guiding principals, circumscribing judges actions. It is not and cannot be just one persons unrestrained opinion as to what is just and what is not. This case is very troubling because the potential for injustice is obvious; however, there is no standard or guiding principles without flaws by which it can be determined legally if injustice exist and this court is not able to devise or divine any either within existing precedent or without. Therefore, in the final analysis, the key indicia which the court will look to determine if substantive unconscionability exist is, as called for by the precedent, whether these tenants are paying significantly higher rents than others similarly situated. The studies, relying heavily on the rents in other filled parks, prepared by the experts for the defense were done in accord with accepted procedures for determining fair market or comparable or market rent and are technically sufficient. The market rent for Mr. Hagen's lot is found to be in accord with these studies. The maximum deviation between the rent paid by Mr. Hagen, he has a corner lot, and the market rent for a similar lot occurred in 1983 and under the Maxwell study was $10/month; however, if the water and sewer are factored in Mr. Hagen's paid less than market rent. The comparisons are no more favorable for him for the other years. Ten dollars a month is not substantively unconscionable either in this court's mind or the legal precedent. See *Garrett v Janiewski,* 480 So.2d 1324 (Fla. 4th DCA 1985) holding that $15 a month over the market rental value of the lots is not unconscionable. The fact that some 56 lots were rented in 1983, apparently under free market circumstances, provides some slight additional support for this result. The claims of unconscionability are therefore rejected.

The court would also note, should this matter be reviewed, that even if the court had found the rents unconscionable this doctrine does not

allow for the affirmative recovery of money damages. *Bennett v Behring Corp.,* supra, at 700; *Garrett v Janiewski,* 480 So.2d 1324 (Fla 4th DCA 1985). Also Fla. Stat. 83.761 (1983) which provided for recovery of damages for noncompliance with the lot rental agreement or the provisions of the statute as repealed effective October 1, 1984. Therefore, unlike some of the other trial courts that have addressed this issue, this court does not believe the law allows for money judgments, refunds, or credits against future rent but only for a declaration that the rents are unconscionable and that the court will not enforce them. The only ways for the tenant to avoid payment or to recover after payment appear to be to refuse to pay the portion of the rent they claim is unconscionable as it is due, obtain an agreement with the owner that rents paid will be subject to the courts final determination, obtain a court order permitting payment into the Court Registry to abide the outcome of the suit or a combination of these actions.

To all of this the court would add its opinion that the doctrine of unconscionability as it now exist will not provide much assistance in setting a proper balance between mobile home park owners and their tenants when a rental amount is in issue and their respective interest and relative strengths will probably have to be reconciled if at all by the legislature. That they are addressing the problem and are also perplexed by it is amply demonstrated in the preamble to the act giving its study commission dealing with the problem additional time to complete its work. See chapter 89-202, Laws of Florida 1989.

## WATER AND SEWER CHARGES

. The second issue is whether the park owner could legally discontinue the provision of water and sewer services as part of the rent and if not, what, if any, relief is available. More broadly the parties place in issue whether a park owner who initially provided these services, or perhaps any service, as part of the rent and has disclosed no other future intent may ever cease providing the service or shift its cost to his tenants.

The shift from the water and sewer being furnished by the park owner as part of the rent to its being a separate obligation of the tenant through direct contract with the City resulted from the unilateral actions of the park owner. It was effective January 1, 1984, and had been preceded by notice mailed October 27, 1983. The plaintiff contends that the City is merely the agent for the park owner in collecting these charges and bases his position that this cannot be done on Fla. Stat. 723.041(b) (1984 Supp.) and the case of *Lemon v Aspen Emerald Lakes Assoc., Ltd.,* 446 So.2d 177 (Fla. 5th DCA 1984). Fla. Stat. 723.041(b) is an exact reenactment in all material aspects, effective

138

June 4, 1984 or 60 days thereafter, of the statute in effect at the time of shift, Fla. Stat. 83.764(4) (1983), and it provides as follows:

Failure on the part of the mobile home park owner or developer to disclose fully all fees, charges or assessments shall prevent the park owner or operator from collecting said fees, charges or assessments and the refusal by the mobile home owner to pay any undisclosed charges shall not be used by the park owner or developer as a cause for eviction in any court of law.

There are no appellate court decisions directly construing this statute. The issue presented here first turns on whether there has been a failure to fully disclose these fees when they are originally provided as part of the rent and, if so, whether the statutes prohibition against the park owner collecting an undisclosed fee should be construed to impose a continuing obligation on the part of the park owner to provide a service which was originally included in the rent. The history and evolution of legislative effort to give some protection to mobile home owners who rent their lots, in general, and of this statutory provision, in particular, provides some slim guidance as to how this statute should be applied. Prior to 1972 there was virtually no protection provided for such owners. Chapter 83, Florida Statutes, 1981. The first step in the evolution of the present statutory scheme occurred in 1972 with the enactment of Chapter 72-28, Laws of Florida 1972. The statutory language here in issue was included in that act. The protections were minimal and when this particular section of the act is read with the other sections, enacted at the same time, it appears that it was intended only to protect the mobile home owner from additional charges being imposed by the park owner after the mobile home owner had assumed occupancy and not from the park owner discontinuing a particular service and placing the mobile home owner in the position of having to purchase that service from a third party. In 1974 the legislature first required written leases be offered to mobile home owners prior to occupancy and that the lease contain the financial obligations of the tenant. Chapter 74-160, Laws of Florida, 1974. Although the general statutory scheme evolved, and continues to evolve, to provide more protections to the mobile home owner these particular provisions were the relevant part of that scheme when Mr. Hagen moved into the park and when the park owner ceased providing the water and sewer. In the *Lemon* case, supra, the Court, relying on the requirement that the lease contain the financial obligations of the tenant, Fla. Stat. 83.760(3) (1981), held that the park owner could not do what was done in this case by a change in park rule because to allow this to be done by rule change would constitute a unilateral

139

amendment to a bilateral lease. The Court further noted "but the amount of rent must be contained in the lease; it is a factor separate and apart from park rules and regulations," and that the cost of the utilities could be considered and computed in the park owners right to increase rents in a subsequent year. Although the Court mentioned the failure to disclose provision, Fla. Stat. 83.764(4) (1981), it does not appear to have relied on it or to have construed it. Although it was only mentioned in passing and not addressed by the Court, it is also interesting that, under apparently similar circumstances, the owner in *Lemon* contended that there had been disclosure. *Lemon* supra, at 183. In the present case the park rules did not address the subject of water and sewer charges, either before or after the change. The lease offered by the park owner for 1984 contained the requirement that the tenant pay water and sewer charges and make all arrangements with the utility companies and/or municipalities. PX018. Mr. Hagen did not sign this lease. This calls into question what happens when the park owners offers a new lease at the end of a preceding one and as often happens in the mobile home park situation the tenants elects not to sign the new one. Similar failure to sign new lease in *Phillips v Cutler,* 388 So.2d 48 (Fla. 2d DCA 1980). This court's answer to this problem is that the law then determines the rights and obligation of the parties as follows: The tender of the new lease is an offer which the tenants accepts by the act of remaining on the property. However, the terms that may be included in these leases have been largely preempted by statute and the statutory requirements must be included in the obligations. Therefore, to the extent the statutes control, the owner cannot relieve himself of obligations or impose additional obligations on the tenants that would be prohibited by the statutes. The terms of the new relationship which the courts will enforce, and enforce them as it would provisions of a lease, are the provisions of the newly offered lease, which are not in derogation of the existing statutory obligations, the existing statutory obligations, which will be considered as terms of the lease, and all prior obligations of the owner or the tenants which the statutes prohibit one or the other from abandoning and for which they have not relieved one or the other by mutual agreement. This is simply what the law will enforce as the terms of the parties lease. It is what the owner will be deemed to have offered with the tender of a new lease and what the tenant will be deemed to have accepted by not executing the lease and remaining in possession. The sale of a park will not affect these terms, the terms of the leases under the new owner will be determined in the same manner and he cannot relieve himself of obligations in leases that resulted from actions of the prior owner. There are certainly problems with this approach and obvious uncertain-

140

ties as to the parties obligations without resort to court action; however, while the legislature has prohibited the owner from requiring the tenant to sign a lease and from evicting for such failure and until the legislature completely or more fully preempts the ability of the owner and the tenant to determine the provisions of their lease agreements there does not appear any other way to harmonize the existing law of contracts and leases with the statutes regulating mobile home tenancies.

Applying this analysis to this case, it would be this court's opinion, as stated, that Fla. Stat. 83.764(4) (1983) did not prohibit the owner from ceasing to provide water and sewer services on January 1, 1984 and that Fla. Stat. 83.760(3) (1983), which requires the lease to contain the financial obligations of the tenant, will not prohibit this action as it did in *Lemon,* supra, because this obligation was provided for in the lease offered for 1984 and as it was part of the conditions the owner could legitimately impose under the law in existence at that time, Mr. Hagen, by the act of remaining on the property, has accepted these terms. There is another aspect, however, that must be considered. The 1983 lease, PX #24, the last lease signed by Mr. Hagen and the lease in effect immediately before that offered for 1984, contained provisions, if not directly imposing, then at least implying an obligation on the part of the landlord to furnish utilities and a provision as follows:

4.

Upon reaching the termination date, this lease shall automatically be extended for an additional period of one year and for additional one year periods thereafter, unless the TENANT shall notify the LANDLORD in writing sixty (60) days prior to the expiration date of TENANT'S intention to vacate the premises. PX-24.

There are provisions for increasing rents for the extended term but none for discontinuing services or for permitting the landlord to terminate the tenancy at the end of 1983 for any purpose material here. This legitimately calls into question the prior analysis and whether this lease goes on forever if Mr. Hagen does not sign another lease, i.e. if the landlord is bound by this lease his unaccepted offer of the 1984 lease is of no effect and he is still obligated to furnish the utilities if so obligated under the 1983 lease as continued. Lease in perpetuity are not favored and a lease will not be construed so as to give it that effect unless such an intention is expressed in unequivocal terms. *Sheradsky v Basadre,* 452 So.2d 599 (Fla. 3d DCA 1984) rev. den. (Fla) 461 So.2d 113; *Hutson v Knabb,* 212 So.2d 362 (Fla. 1st DCA 1968). It appears that the parties must use terms such as "forever", "for all time" and

"in perpetuity" in order to clearly express such an intent. C.f. *Lattimore v Fisher' Food Shoppe, Inc.,* 329 S.E. 2d 346 (N.C. 1985). The correct construction of the 1983 lease is that it provides for only one renewal. *Sheradsky* and *Hutson,* supra. The effect of this, however, is to make the failure of the owners of provide water and sewer during 1984 a breach of the lease entitling Mr. Hagen damages for breach of lease in an amount equal to his cost to obtain the service from the City, plus interest to date. The two different owners during this period are liable for the damages occurring during the period of 1984 when they were the owner or Landlord. The new owner offered by letter dated September 28, 1984, a lease for 1985 that contained the same provisions that the Tenant pay the water and sewer charges that had been included in the lease offered for 1984. NTX-4. The 1983 lease no longer prohibited this action and it appears now to be permitted under the earlier rationale ' however, the situation is complicated by the fact there was a major revision in the relevant statutes in 1984. "Florida Mobile Home Act" chapter 84-80, Laws of Florida, 1984 (originally enacted as chapter 720 in relevant part but renumbered chapter 723 by publication of Florida Statutes 1984 Supp.). However, whether the 30 day notice requirement of the repealed statute, Fla. Stat. 83.764(3)(a) (1985) or the 90 days notice required by Fla. Stat. 732.037(1) (1984 Supp.) applies, the notice requirements are satisfied by the September 28, 1984 mailing of the lease containing the provisions for tenant responsibility for water and sewer offered for 1985 to go into effect January 1, 1985. NTX-4. Although this court can attach no materiality to it, it is noteworthy that the old notice provision appears to have been repealed effective June 4, 1984 and the new one not put in effect until October 1, 1984. There does not appear to be anything else in the new act that would prohibit the inclusion of these changes in the lease; indeed, it carries forward provision in the earlier act, Fla. Stat. 83.755 (1983), that except as the rental agreement must contain the statutory protections other conditions of the tenant may be provided for in the lot rental agreement as the parties determine them. Fla. Stat. 723.032 (1985). The final result of this analysis, then is that Mr. Hagen may only recover damages for breach of his 1984 lease, as interpreted by the court, and those damages shall consist of all cost of water and sewer, including the loss of use of the $15 turn on charge and the $30 deposit for the one year before he would have had to pay them. Considering that the Park ownership changed September 19, 1984 and referring to PX #30 the damages are computed as follows. Mr. Graviss - $109.46, bills through end of August, plus [($15= $30)× 12%]× (262 days till September 19 divided by 365 days) for total interest of $72.18 and total damages of $185.52. National Trust - applying the same method the

142

results are $68.68, bills, $1.52, loss of use, $42.33, interest from December 31, 1984 for total damages of $112.53. If either party wishes to calculate the interest from the date of each bill he may do so and submit an amended partial final judgment.

Although this completes the explanation of the result a few other comments are appropriate to settle this matter in the event this decision may be reviewed. First, to the extent it may be determined contrary to this decision that the owner cannot transfer the water and sewer charges to the tenant, this will be treated as a breach of lease for each lease period in which it occurs with damages as stated and to the extent it may continue, there have been statutory changes, an order would be entered permitting the cost to be deducted from the monthly rental until such time as the charges can be and are lawfully transferred. Second, laches has been pled as a defense and the cost incurred in installing the water meters and actions incident thereto make its application fairly debatable; however, given the fact the tenants first received notice of the owner's intent to transfer these charges October 27, 1983, the meters were already installed by January 1, 1984 (probably earlier) and they instituted suit on March 7, 1984, leaches should not, in this court's opinion, bar this action. The suit would have to have been begun before the first of the year as prejudice to the owner does not result from delay after the meters were installed and this 65 days is an unreasonable period to limit the suit. This is also, as analyzed by this court, an action for breach of lease which is a legal action for damages which is not subject to laches. Third, if the action of the owner did not transfer the charges in 1985, as determined by the court, then the statutory changes in 1986 apparently requiring a reduction in rent incident to a reduction in services would, as there has been no reduction, possibly bar the action after July 1, 1986 and thereafter during the existence of this statute without a reduction in rent. Fla. Stat. 723.031(3) (1987). Fourth, and finally, it may be noted the increased cost of water and sewer was for the most part attributable to increased usage (or the increases are not separable from the evidence) and therefore, lease provisions dealing with rate increases resulting from governmental action, as well as statutes dealing with pass through of increased cost due to governmental action, have no relevance. Fla. Stat. 83.760(3) (1983) for example.

## EFFECT OF NEGOTIATIONS FOR THE 1986 LEASE

Resolution of this issue is no longer necessary; however, given the possibility of review, the court deems it appropriate to briefly set forth its views. Referring to finding of fact #15, first the court is of the

143

opinion that the wording of the agreement, NT #1, mentioning only a $10 increase and not a total rent and the surrounding circumstance that this suit was pending, favor Mr. Hagen's position that this agreement was not intended to do more than limit the amount of the increase and does not foreclose the claim that the total rent for that year was unconscionable or should it form a base from which to judge other years.

Additionally, although the procedure followed were not strictly in accordance with the statute, the parties were in effect attempting to act under the dispute settlement procedures authorized under Fla. Stat. 723.038 (1984 Supp.). The use of this procedure for subsequent years failed to produce agreement. However much it may simplify park management and dispute resolution to construe the relevant statutes, Fla. Stat. §§ 723.037, 723.038, & 723.075 (1984 Supp.), to permit the Association or a majority of the tenants to bind each individual tenant, the legislature has provided that the powers of the Association do not limit any statutory or common law right any individual home-owner or class of home owners may have to bring an action that may otherwise be available. Fla. Stat. 723.079(1). Therefore, even in the absence of a finding that the agreement was not intended to settle the total amount of the rent it would appear that a tenant or group of tenants could not be barred by a act of the association or a majority of the tenants from bringing an action such as this. Practically, however, it may be next to impossible for a tenant to successfully claim a provision of a lease as unconscionable if a majority or the representatives elected by the majority have by the act of acceptance said in effect that it is not unconscionable.

## LEASE PROVISIONS

In the Supplemental Complaint there are a number of allegations directed to provisions in the leases. No argument was directed to these issues and the court is unsure if the parties are expecting a ruling on the validity of these provisions so nothing will be included in the Partial Final Judgment that will accompany this explanation. However, if a ruling is desired it may be obtained when the court settles the reserved issue of attorneys fees and if further argument is desired it may be had at that time. Without being bound the court would set forth its tenative views as follows:

1. $10 law trimming charge for the close trimming is valid. It is proper that close trimming be required to maintain appearance and value for all owners. Close trimming arguably goes beyond normal yard maintenance and the likelihood of damage to the tenants foliage

144

and property in the course of carrying it out make it reasonable that there be incentives for the tenant to do it himself.

2. Requirement that person who purchases from an existing owner sign a lease is invalid. The Tenant does not have to sign a lease and he should be able to sell what ever rights and interest he has. If the purchaser has to sign a lease he may well not be able to purchase what the tenant may sell because by the lease he may be forced to contract away some of what the tenant may be entitled to sell. When the purchaser has not signed a lease the law will make one for him in the fashion previously described.

3. $5 per month for guest over 30 days. No explanation for this was offered in the case and the court is aware of none since the tenant pays his own utilities. The court express no position at this time. Particularly since the prayer for relief in the complaint only request relief from 1 & 2.

## CONCLUSION

The court has not otherwise addressed Mr. Hagen's claims for $21.00 per month for cutting his lawn from 1979 to the extent that this may be in the pleadings. The court is of the opinion that there is no legal basis for such a recovery and the act was in essence a voluntary one done under circumstances in which neither the park owner or Mr. Hagen had any reasonable expectation or belief that payment would be made or required. All other claims and defenses not addressed are denied and this Explanation of Partial Final Judgment will be accompanied by a brief Partial Final Judgment providing only for the relief granted.

DONE this 8th day of January, 1990.