TY, INC., Plaintiff,

v.

**PUBLICATIONS INTERNATIONAL, LTD., and Penguin Putnam, USA, Defendants.**

No. 99 C 5565.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 24, 2000.

Avrum Sidney Katz, Michael A. Bondi, Welsh & Katz, Ltd., Chicago, IL, for Ty Inc, plaintiff.

Wayne B. Giampietro, Michael John Merrick, Witwer, Poltrock & Giampietro, Chicago, IL, for Publications International Inc, Penguin Putnam USA Inc., defendants.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

Ty, Inc. makes Beanie Babies® which have been, to my perception, extraordinarily popular toys both in terms of the sheer number (over a billion) of them which have been distributed and the very number of years (at least five) that they have been prominent in the marketplace.[1]

The defendants do not make rival products—plush toys; they make books about Beanie Babies®. Ty has designed and sold over 200 different Beanie Babies®. New ones are issued periodically and older ones are retired; that is to say, Ty stops making additional toys of a model it retires. By making many different styles of Beanie Babies®, Ty creates the possibility that some people will wish to collect them. I have personal knowledge of at least two such persons, both of them in the early stages of the American educational process. One of these collectors displays her gift for cataloguing and her nascent interest in zoology by organizing her collection into Beanie mammals, Beanie aquatic creatures (excluding aquatic mammals), Beanie prehistoric creatures, Beanie flying creatures and Beanie mythical creatures. There may have been, over the years, other organizing principles of the collection, but I was unable to sustain my interest long enough to grasp them fully. The other collector is primarily interested in the projected cash value of the toys, particularly the discontinued models, all to the end of financing a planned period of attendance at medical school in the far-off future.

By design, the Beanie Babies® become collectibles, and around them has arisen a business devoted to serving the interest of the collectors by providing them with information about Beanie Babies®. There are books and websites that offer exhaustive lists, with photographs, of all known Beanie Babies® and information about the current and projected market value of each Beanie Baby.[2] There is information too about peripheral Beanie Baby facts, i.e., the different kinds of heart-shaped hang tags that come with each toy and how these tags evolved over time. Beanie Babies® are privately traded and sold among collectors, and there are auctions over the internet. Perhaps there are chat rooms for devotees. According to the defendants, there is a gray-market for certain Beanie Babies® meant for sale only in the U.K. and Canada, but nonetheless desired by collectors in the United States. Leaving to one side the average age of the collectors, this is much like the world of baseball card enthusiasts.

The defendants produce and sell a book about Beanie Babies®, which includes an historical essay on the subject and a Baby-by-Baby catalogue, a page per Baby. Each page has a picture of the toy, its date of birth, date of release, date of retirement, if any, and its estimated value along with other data, including such things as mis-

---

1. One of the earliest cases I heard as a judge involved a stuffed bear (as well as other animals) designed, made and sold by Ty, Inc. The stuffed animals in that case were probably 10–15 times larger than a Beanie Baby, and this ratio increases in dealing with Teenie Beanie Babies™ distributed with children's meals at McDonald's. Those products were, it was represented to me, highly favored and sold well. I suspect the sales figures for those products would be thought trivial if compared to the sales of Beanie Babies®. See *Ty, Inc. v. MJC–A World of Quality*, 93 C 3478, 1994 WL 36880 (N.D.Ill. Feb.8, 1994).

2. I suspect that Beanie Baby is not proper terminology, but I write it at times because I am weary of using the ® symbol.

printed labels, which are rare and increase value. The author also rates some as Highly Recommended, as is Floppity (the lilac rabbit). Gobbles (the turkey) is not highly recommended. According to defendants, prices range from the $5–7 category, into which many fall, all the way to the rarefied upper values of Bongo (the monkey) (tan-tailed Nana only) at $4000, Peanut (the elephant) (royal blue only) $5000, and Punchers (not Pinchers) (the lobster) at $4750.

Ty holds copyrights to the original soft sculptures marketed as part of its line of toys, and it has trademark registrations for the marks associated with the product and its heart-shaped hang tags. It has common-law trademarks too. It wants me to enjoin defendants from publishing and selling its books: *For the Love of Beanie Babies* and *Beanie Babies Collector's Guide.* The books' covers do contain the legend: *This publication is not authorized or licensed by Ty, Inc. Publications International, Ltd. is not affiliated with Ty, Inc.*

Ty obviously is not displeased, in principle, with books or magazines for collectors of the toys—this is precisely what the creator of collectibles wants to occur. The company has licensed three such publications and is willing to license others. Indeed, Ty has licensed a corporation to form the BEANIE BABIES OFFICIAL CLUB. The club gives out information about the toys and sells related products. At least one licensee has complained to Ty about competing with defendants' unlicensed product. But, says Ty, the defendants here do not have licenses, and their books display unauthorized photographs of the copyrighted Babies and the trademarks. Ty wants the defendants stopped, as they have had others stopped in this Court. *See Ty Inc. v. West Highland Pub. Inc.,* 98 C 4091, 1998 WL 698922 (N.D.Ill. 1998) (Norgle, J.).

Defendants begin by saying that no injunction may issue against publication of its books because the First Amendment prohibits such injunctions. They rely heavily upon *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), which held that the First Amendment protected a magazine from an invasion of privacy suit (absent knowing or reckless falsity) by a family, an incident from whose life was falsely portrayed by *Life* magazine. The case is memorable for its divisions: two Justices joined the majority opinion only "in order for the Court to be able to agree on an opinion in this important case." 385 U.S. at 398, 87 S.Ct. 534 (Black and Douglas, JJ.). It is memorable for its alignments: Brennan, Stewart, White (with Black and Douglas) vs. Harlan vs. Fortas, Clark and Warren. It is memorable for the fact that Richard M. Nixon argued for Hill. It is memorable that false portrayals did not cast the plaintiffs in a bad light. It is not memorable for any discussion of the relationship of copyright and trademark protection to the ambit of First Amendment protection.

The Supreme Court did address that relationship in *Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), a case in which a human cannonball sued a television station for videotaping his entire 15–second act and then broadcasting it. Zacchini thought that the free broadcast might reduce the number of persons willing to pay to see it. Over objection that *Time, Inc. v. Hill* precluded a lawsuit over the broadcast, the Court wrote:

> The Constitution no more prevents a State from requiring respondent to compensate petitioner for broadcasting his act on television than it would privilege respondent to film and broadcast a copyrighted dramatic work without liability to the copyright owner. 433 U.S. at 575, 97 S.Ct. 2849.

In *Cohen v. Cowles Media Co.,* 501 U.S. 663, 669, 111 S.Ct. 2513, 115 L.Ed.2d 586, the Court said: "The press, like others interested in publishing, may not publish copyrighted material without obeying copyright laws."

These cases do not destroy defendants' argument, because, they concede, at least at this stage, that they might be liable for damages. It is the prior restraint, the injunction against further distribution, which, they say, is a violation of the First Amendment. Taken literally, the words of the Supreme Court authorize injunction, because "obeying copyright laws" usually includes obeying orders to stop violating the copyright. But the Supreme Court has not explicitly said that copyright injunctions are permissible against the press, although there is a hint that such injunctions are legal in *San Francisco Arts & Athletics v. United States Olympic Committee*, 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (upholding injunction against use of the term "Olympics" to describe an athletic competition where Congress had granted exclusive use of word to the United States Olympic Committee).

■ The hint must be fairly strong because there are not many reported cases in which challenges to copyright or trademark injunctions are made upon First Amendment grounds. Those challenges that are made have been summarily rejected. A parodist once wrote a poem about the O.J. Simpson murder trial entitled *The Cat NOT in the Hat! A Parody by Dr. Juice*, which was found to be an infringement of *The Cat in the Hat*, by Dr. Seuss. On appeal, the panel of the Ninth Circuit said in a footnote that it "reject[s] outright [the] claim that the injunction in this case constitutes a prior restraint in violation of free speech guaranteed by the United States Constitution." *Dr. Seuss Enterprises L.P. v. Penguin Books*, 109 F.3d 1394, 1403 n. 11 (9th Cir.1997). The short shrift given to the claim is typical of all the cases cited by the Ninth Circuit. I too reject the bald claim that the injunctive relief sought violates the First Amendment absent extraordinary circumstances. I deny the motion to strike the request for injunctive relief. The fair use doctrine, which I address in a moment, is adequate

protection of the defendants' constitutional right to comment upon and criticize the Beanie Babies, individually or as a whole.

■ The standards for preliminary injunction are well known. I am to consider likelihood of success (more than negligible is the minimum), inadequacy of money damages or irreparable harm, the balance of harms to the parties from the wrongful granting or denial of injunctive relief and the consequences of the ruling to the public. These factors are somewhat interdependent, because an overwhelmingly good case on the merits might justify an injunction even if the harm of denying the injunction is not very great. *Storck U.S.A., L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir.1994); *Abbott Lab. v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir.1992).

The photographs of the Beanie Babies in defendants' books are reproductions of the copyrighted works of the plaintiff, and I do not find that this is disputed. *See, e.g., Sheldon v. Metro–Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir.1936)(motion picture copied from a play); *Ringgold v. BET*, 126 F.3d 70 (2d Cir.1997)(artwork converted into set decoration for television show). At the least, the books are derivative works as Judge Norgle similarly concluded in *Ty, Inc. v. West Highland Publishing Inc.*, 98 C 4091, 1998 WL 698922 (N.D.Ill. Oct.5, 1998). The defendants do not deny that they, along with the rest of America, had access to the Ty works.

The use of trademarks is also quite clear. Beanie Babies and the Ty Heart Logo are used on the cover of the books and throughout them. And there is little dispute that these and other marks are Ty's and are both strong and protectable. *See International Kennel Club v. Mighty Star, Inc.*, 846 F.2d 1079 (7th Cir.1988) (general outline of trademark protection standards).

Leaving aside the effect of the disclaimer on the cover of the defendants' books, there is a substantial likelihood of confusion. One could easily believe the books

are Ty products. The books look like and serve the same purpose as Ty's licensed products, and they are marketed to the same audience. Even in the absence of Ty's licensed products, it is likely that defendants' books fall under the doctrine that protects against use of the mark in related product and services markets. *Tally–Ho v. Coast Community College Dist.,* 889 F.2d 1018,1027 (11th Cir.1989). And there is not much incentive for the consumer to examine the items carefully since they cost less than ten dollars. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 616 (7th Cir.1993). I leave aside the disclaimer because defendants do not rely upon it to save themselves from claims of likelihood of confusion.

■ Once likelihood of success on the merits is shown, irreparable harm is presumed to exist when copyright or trademark is infringed. I have said so. *Jackson v. MPI Home Video,* 694 F.Supp. 483, 488 (N.D.Ill.1988). Much more importantly, our Court of Appeals (along with every other Court of Appeals) has said so. *Atari, Inc. v. North American Philips Consumer Elec. Corp.,* 672 F.2d 607, 620 (7th Cir.1982); *Wesley–Jessen v. Bausch & Lomb,* 698 F.2d 862, 867 (7th Cir.1983). And, in any event, Ty has received complaints from its licensees who compete with defendants, and damage to relationships with licensees is real, not simply presumed, irreparable injury.

The public interest will not be disserved by issuance or denial of the injunction. The public may benefit from enforcement of intellectual property rights of Ty, and the public may benefit from access to the guidebooks of the defendants.

Balance of harms favors neither party when weighed in the abstract. Wrongfully granting the injunction against defendants would entirely exclude their current products from the marketplace, and, I assume, for purposes of this motion, that a substantial number (but surely less than all) of those who would purchase a Beanie Baby collector's guide would not purchase more than one. The defendants would lose forever the opportunity to sell their products to some likely purchasers. Indeed, the collector's guides are perishable goods, the information in them needs updating, and an injunction might destroy the value of the entire current edition.

Wrongfully denying the injunction would leave Ty with the potential loss of its licensees who produce products that compete with defendants' goods. Ty would not only lose its royalties, it would have to find new licensees or repair its relationships with current ones. Even if it waives its fees to keep its licensees happy, it may suffer losses to its image as a steadfast protector of its copyrights and trademarks. Finally the wrongful denial of injunction may well encourage others to do what defendants have done, thus increasing the injury to Ty and inflicting expense on Ty to defend its intellectual property interests.

There are real, equally substantial harms to both sides here if the preliminary ruling does not hold up.

The answer to whether the injunction should issue must be found in analysis of the two factors of irreparable injury and likelihood of success; indeed, these are the two points that the defendants raise in opposition to the motion for preliminary injunction. They say that Ty delayed for so long before seeking the injunction that its irreparable injury claims have expired, and they assert that their use of Ty's copyrights and trademarks is fair use permitted by the law.

■ Ty wrote to defendants on 7 August 1998 asking them to cease publishing their Beanie Baby books. It did not seek an injunction until 6 October 1999. A fourteen-month delay between learning of an infringement and seeking injunctive relief would cause some courts to discredit claims for injunctive relief. *See Lanvin, Inc. v. Colonia, Inc.,* 739 F.Supp. 182 (S.D.N.Y.1990)(seven-month delay). Of course, a plaintiff can offer a good expla-

nation for the delay and still secure injunctive relief. The explanation usually offered and accepted is that settlement discussions were ongoing. *Ocean Garden, Inc. v. Marktrade Co.,* 953 F.2d 500, 508 (9th Cir.1991); *Kraft General Foods v. Allied Old English,* 831 F.Supp. 123, 136 n. 12 (S.D.N.Y.1993). Here Ty says, without contradiction, that settlement discussions went on continuously, almost reaching fruition in March 1999 before breaking up over the publication of a new edition in August 1999 after which Ty filed suit. On 10 September, a final settlement effort was made and failed when defendants stated they were unwilling to cease publishing or to pay Ty for the use of Ty's intellectual property. The delay that counts against Ty is from 10 September to 6 October, and such a delay does not impinge on the showing of irreparable injury, nor does it justify the use of laches to bar injunctive relief.

Indeed, the principal thrust of the defendants' argument is that their conduct is protected by the doctrine of fair use, which permits reasonable use of another's intellectual property without the consent of its owner. *Harper & Row, Publishers v. Nation Enterprises,* 471 U.S. 539, 549, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

■ Fair use doctrine, a judicial creation, was codified by Congress. *See, e.g., Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 577–78, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) and 17 U.S.C. § 107. I am required to consider four factors:

1. *The purpose and character of the use, including whether it is commercial in nature or not-for-profit.*

The use here is clearly commercial, a point in Ty's favor. *See Campbell,* 510 U.S. at 585, 114 S.Ct. 1164. The defendants concede this, but argue that their work is commentary upon the toys: to wit, a compilation of each one's history, an evaluation of each toy, and an assessment of each one's market value. Thus, they argue, it is transformative, and the more transformative is the defended work, the less its commercial nature will count against its sellers.[3]

A work is transformative when it uses an earlier work as a foundation upon which something new is built, something beyond, in some way, the ambit of the earlier work. So in *Penelope v. Brown,* 792 F.Supp. 132, 138 (D.Mass.1992), Judge Young said it was transformative for an author to borrow a section from a professor's scholarly anthology, simplify it and use it in a manual for ordinary folk to use if they want to try their hands at writing popular fiction. Claims that works are transformative are not ordinarily successful. *See Castle Rock Entertainment, Inc. v. Carol Publishing Group,* 150 F.3d 132 (2d Cir.1998) (a book of trivial questions about *Seinfeld* not fair use, because converting expression embodied in the show into a trivia quiz book not transformative); *Horn Abbot Ltd. v. Sarsaparilla Ltd.,* 601 F.Supp. 360 (N.D.Ill. 1984) (book entitled *In Further Pursuit of Trivial Pursuit,* which contained all six

---

**3.** "Transformative" may not be the best word for the concept. For one thing, my spell-check program, itself purchased by the administrative arm of the federal judiciary, keeps flagging the word with red underlining, a sure sign that it has taken offense. For another, the root word "transform" is usually thought to mean to change into a different shape or form. XVIII THE OXFORD ENGLISH DICTIONARY 399 (2d ed.1989). Roget's 21st Century Thesaurus says to transform means to change completely, and it offers synonyms that speak of radical change such as revolutionize, transmute and transfigure. "Adapt,"which means to alter or modify so as to fit for a new use, I THE OXFORD ENGLISH DICTIONARY 139, or "vary," to introduce causes or changes into, XIX THE OXFORD ENGLISH DICTIONARY 454, might have been better root words, but I would not be the first to note that the law is written in Legal not in English. *See* SCOTT TUROW, ONE L 57 (1977). And the Supreme Court is the final arbiter of American Legal usage, much as the French Academy is the final arbiter of French usage; that is to say, one need not always speak as the Academy commands, but one is always safer if one does so.

thousand questions from an edition of the Trivial Pursuit board game, not transformative); *Paramount Pictures v. Carol Pub.*, 11 F.Supp.3d 329 (S.D.N.Y.1998) (*The Joy of Trek*, a book which set out the history and personalities of the Star Trek series and included plot summaries, not transformative, because did "not add anything substantial that is new to the Star Trek story"). One defendant here did secure a finding that its books on how to win at "PAC–MAN" were transformative in part, but it failed in its overall claim that its books were transformative. And, it failed on the claim of fair use with respect to the covers of its book which reproduced copyrighted PAC–MAN material. *Publications International, Ltd. v. Bally Mfg. Co.*, 215 U.S.P.Q. 861, 1982 WL 52525 (N.D.Ill.1982). Here too, the covers of the books are full color photographs of Ty's Beanie Babies.

It is quite clear that the photographs of Ty's copyrighted and trademarked plush toys are an important, perhaps even dominant, element of the attractiveness of the book to potential purchasers. In their marketing materials, defendants compare their work to those of their competitors and tout their own products by telling purchasers that "other guides show only sketches of each Beanie Baby or cram several photos onto one page, but *Beanie Babies Collector's Guide* features beautiful full-color photography and displays each Beanie Baby on its own page. In this way, we are able to include all the most important information, and the reader is able to get a great look at each and every Beanie Baby."

The defendants' products are not transformative, and, quite likely, not meant to be transformative.

### 2. *The Nature of the Copyrighted Work.*

That which is most creative deserves the most protection from copying. 4 NIM-MER ON COPYRIGHT § 13.05[A][2] (3d Ed.1997). The Beanie Babies are "creative, fictional works," as Judge Norgle said in *West Highland,* 1998 WL 698922, at *14. None of the arguments offered by defendants helps their case, neither the wide publication of the copyrighted works, nor the withdrawal of some of them from the market, *i.e.,* retiring a Beanie Baby, despite some scattered dicta to the contrary.

### 3. *Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole.*

The defendants state, with some justice, that their works are commentary and criticism. They evaluate each Beanie Baby. In such cases, one can use substantial parts of another's work, because the commentary merely supplements but does not replace the function of the work that is the subject of the comment. 4 NIMMER ON COPYRIGHT § 13.05[A][3]; 17 U.S.C. § 107; *Consumers Union v. General Signal Corp.,* 724 F.2d 1044, 1049 (2d Cir.1983). Defendants wisely do not argue that they make insubstantial use of the copyrighted materials; the most prominent feature of every page of their books is a photograph of the copyrighted toys and the trademark heart-shaped hang tag. They do point out that many of the Beanie Babies have features in common, and some of the Beanie Babies came in multiple editions with small differences, usually of color, so that it would be impossible to discuss them without showing what they look like.[4] To which the plaintiff says that this might justify using photographs of some small percentage of Beanie Babies, it does not justify the use of the complete line of copyrighted toys. The defendants could use verbal descriptions, color samples and generalized drawings to accomplish its goals of commenting on the plush toys. This too would suffice to permit comment

---

**4.** There are three Bongos (the monkey) and the first Bongo was originally called Nana, three Mystics (the unicorn), two Peanuts (the elephant), two lobsters (one Pincher, the other Puncher), six Teddys (the new-faced bear), and five Teddys (the old-faced bear).

on the fourteen different bears and fifteen dogs which, necessarily, have some features in common.

### 4. Effect of Use Upon the Potential Market for Plaintiff's Toys.

I take as true the claim that defendants' products do not harm the market for Ty's plush toys—a point that Ty does not bother to dispute. I take as true that the defendants' products do harm Ty's market to license the use of its copyrights, as it has already done with six publishers—a point which defendants do not bother to dispute. Both sides seek to use the fact that Ty has said publicly that it intends to retire all current Beanie Babies. In the milieu of this case, the fact cuts against defendants. I think that the licensing of collector's guides are likely to become more valuable to Ty as more of the plush toys are retired.

I find that the fair use doctrine is not likely to succeed, though only trial on the merits will yield a definitive answer. In any event, there remains a reasonable likelihood that Ty will prevail despite the fair use defense.

■ To prevail on the trademark claim, Ty needs to show likelihood of confusion. Use of trademarks to refer to something which is the subject of commentary, to identify the subject of commentary, is not a violation of the Lanham Act. The law in this respect has been made with respect to titles of various sorts. *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir.1989) ("Ginger and Fred"); *Playboy Enterprises, Inc. v. Welles*, 7 F.Supp.2d 1098 (S.D.Cal.1998) ("Playmate of the Year"). As the Second Circuit said, subject to an important exception not relevant here, the use of a celebrity's name will not violate the Lanham Act, "unless the title has no artistic relevance to the underlying work whatsoever or ... the title explicitly misleads as to the source or content of the work." [5] *Rogers*, 875 F.2d at 999. What is true in all of the title cases, most of which are discussed in *Rogers v. Grimaldi*, is that the use of the trademark does not imply sponsorship or endorsement by the trademark holder. Indeed in *Playboy Enterprises, Inc. v. Welles*, there were explicit disclaimers on Terri Welles' web site that it was not endorsed by Playboy, she did not use the bunny logo or type fonts similar to those used by Playboy. She simply stated, truthfully, that she was once named Playmate of the Year, and her use of the title was not contractually prohibited by any agreement she had with Playboy.

In the context of this case, it may well be that defendants could use some of Ty's marks to identify the plush toys about which they write, but it appears at this preliminary stage that a significant number of consumers might confuse defendants' works with the guides and material licensed by Ty.

There is a strong showing of likelihood of success by and of irreparable injury to Ty. There is nothing in the public interest to bar injunction. The balance of harms

---

5. "Fred and Ginger" is a Federico Fellini film about two characters, cabaret performers (played by Guiletta Masini and Marcello Mastroianni), who imitated Ginger Rogers and Fred Astaire, were known in Italy as Ginger and Fred, and appear in a television show reunited years after they retired. According to the Second Circuit, the film received mixed reviews and played only briefly in the United States. Since 1989, the retrospective reviews have turned brighter. The film is praised for its bittersweet, nostalgic account of the two performers and its satire of television and fame and mildly criticized for its leisurely pace and the occasional obviousness of its satire. The Second Circuit and the District Court found the title to be truthful and artistically relevant to the film, accepting Fellini's affidavit that Rogers and Astaire were "a glamorous and care-free symbol of what American cinema represented during the harsh times which Italy experienced in the 1930's and 1940's." The Court of Appeals said of Fellini that "he contrasts this elegance and class to the gaudiness and banality of contemporary television, which he satirizes. In this sense, the title is not misleading; on the contrary, it is an integral element of the film and the film-maker's artistic expressions." 875 F.2d at 1001.

weighs equally on both sides or slightly on the side of the defendants, but the likelihood of success is sufficiently strong to justify the preliminary injunction despite the fact that the defendants' harm may outweigh the plaintiff's harm by a bit. The balance of harms analysis does affect the question of what bond ought to be posted by Ty, *see Mead Johnson v. Abbott Lab.*, 201 F.3d 883 (7th Cir.2000), and I order the parties to submit simultaneous briefs on the question of the amount of the bond by 27 January 2000. Once I determine the correct amount of the bond, I will issue the preliminary injunction.