CRC PRESS, LLC, Plaintiff,

v.

WOLFRAM RESEARCH, INC.,
Stephen Wolfram, and Eric
Weisstein, Defendants.

No. 00–CV–2262.

United States District Court,
C.D. Illinois,
Danville/Urbana Division.

Oct. 23, 2000.

James C. Kearns, Heyl, Royster, Voelker & Allen, Urbana, IL, Mitchell R.

Bloomberg, Ellen M. Leibovitch, Adorno & Zeder, PA, Miami, FL, David Rabinowitz, Philippe Zimmerman, Noeleen Walder, Moses & Singer, LLP, New York City, for CRC Press LLC, plaintiff.

Douglas J. Quivey, Lara L. Quivey, Webber & Thies, Urbana, IL, Bradford P. Lyerla, Wallenstein & Wagner, Ltd., Chicago, IL, Janet T. Munn, Steel, Hector & Davis, LLP, Miami, FL, for defendants.

## ORDER

McCUSKEY, District Judge.

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction (# 13), Defendant Stephen Wolfram's Motion to Dismiss Complaint for Lack of Personal Jurisdiction (# 30), and Defendants' Motion to Defer Ruling on Preliminary Injunction (# 48). Plaintiff, CRC Press (CRC), filed a complaint alleging that Defendants, Wolfram Research, Inc., (WRI), Stephen Wolfram (Wolfram), and Eric Weisstein (Weisstein) willfully infringed upon CRC's copyright in the book *CRC Concise Encyclopedia of Mathematics* (Encyclopedia) by placing a significant portion of the content of the Encyclopedia on WRI's website, Mathematica, under the name "MathWorld." Furthermore, the complaint alleged contributory copyright infringement and vicarious copyright infringement against Wolfram, tortious interference with contractual relations against WRI and Wolfram, and breach of contract against Weisstein. Plaintiff now seeks a preliminary injunction to enjoin Defendants from continuing to maintain "MathWorld" on the WRI website. After careful consideration of the pleadings, the Court GRANTS the Plaintiff's Motion for Preliminary Injunction (# 13). Defendant Wolfram's Motion to Dismiss for Lack of Personal Jurisdiction (# 30) and Defendants' Motion to Defer Ruling on Prelimi-

nary Injunction (# 45) are denied as MOOT.

## I. FACTS

The mathematical reference information which constitutes the substance of *CRC Concise Encyclopedia of Mathematics* began its evolution in 1995. At that time, Weisstein was a Staff Scientist in the Division of Geological and Planetary Sciences at the California Institute of Technology (Caltech). He had been collecting notes to develop this reference work for approximately ten years. It was not until Weisstein took his position at Caltech, however, that he began to convert these notes into a web-based reference work entitled "Eric's Treasure Trove of Mathematics" (Treasure Trove). The site met with success on the internet and developed into a dynamic work to which people accessing the site could add their own entries.

After accepting a position at the University of Virginia in 1996, Weisstein decided to adapt Treasure Trove to book form with the hope of advancing his reputation in the academic community. CRC was one of the publishers who received a manuscript from Weisstein. Timothy Pletscher (Pletscher) was the first editor at CRC with whom Weisstein dealt. In his affidavit, Weisstein indicated that he sent an email to Pletscher during the negotiation process which stated: "As I recall, there were a few outstanding issues left, including . . . how to format a CD–ROM version . . . [and] the possibility of maintaining my present WWW site . . . once the CD is out, not to mention contractual details."

In March 1997, Robert Stern began editing mathematics titles for CRC, replacing Pletscher. On April 4, 1997, Weisstein received a letter from Stern containing an Author Agreement which, according to Weisstein, Stern described as "very straight forward and easily understood." Weisstein stated that he "took this to mean that CRC had agreed in substance to the discussions [he] had with Mr. Pletscher and [his] discussion with Mr. Stern, including [his] desire to maintain a free and publicly accessible website." After receiving the contract, Weisstein reviewed the contract and had a number of discussions with Stern. The only element of the contract for which Weisstein was able to negotiate a change was the royalty rate on derivative works.[1] Stern agreed to increase the royalty on these works from five to ten percent. Weisstein signed and returned the contract in April 1997. Weisstein stated in his affidavit that he informed Stern of his plan to continue to develop the website from which the Encyclopedia was derived. Furthermore, Weisstein contends he believed that "Work" as defined in the contract meant only that CRC had rights to the manuscript of the Encyclopedia rather than to the content of the website.

In May of 1997, Stern and Weisstein discussed the possibility of creating a CD–ROM version of the Encyclopedia. As a result of these talks, Weisstein and CRC entered into a second contract on December 7, 1998, which contained the same copyright assignment language as the initial Author Agreement. During these negotiations, Stern informed Weisstein that is would be a good idea to eliminate or substantially impair the website once the book was published. In a later letter, Stern informed Weisstein that he should "leave the web sites alone until [his] book is almost published as it [sic] will provide

---

1. Stern later substituted a corrected page in the contract to indicate a change in the amount of royalty.

lots of free advertising which can only bring ... lots of sales." Throughout this pre-publication period, Weisstein had been maintaining and expanding portions of his website. However, as a result of these discussions, Weisstein began limiting access to the website in November 1998, by "randomly choosing a set of letters of the alphabet and blocking all entries starting with those letters." However, Weisstein states in his affidavit that he did this out of "a sprit of voluntary cooperation to advance [CRC's and Weisstein's] shared interest" rather than out of any sense of contractual responsibility.

The Encyclopedia was first published on approximately December 1, 1998. Four months after publication, Weisstein wrote Joseph Ganzi of CRC's electronic publishing group in hopes of once again being able to place the full version of the Encyclopedia on his website. However, full access to the website was not made available at that time. Sales of the first printing were strong, and the Encyclopedia sold out in a matter of months. The Encyclopedia became CRC's best-selling mathematics title.

Weisstein contends in his affidavit that he still did not believe he had transferred his rights to the website in the Author Agreements he signed with CRC. He bases this belief on the following: (1) "The CD–ROM published by CRC contains a link to the 'Encyclopedia of Mathematics Home Page,' given as *www.treasure-troves.com/math/*"; (2) "The email address given on every page of the CD–ROM is ... *comments@treasure-troves.com*" which is Weisstein's website; (3) "The in-troduction page of the CD–ROM is titled Concise Encyclopedia of Mathematics CD–ROM: A Treasure Trove of Mathematical Formulas, Facts, Figures, and Fun" which Weisstein contends identifies it as an adaptation of his Treasure Troves website; and (4) "Each of the thousands of pages of encyclopedic material on the CD–ROM published by CRC contains the copyright statement '© 1996–9 Eric W. Weisstein, 1999–05–26.' " [2]

In February 1999, Weisstein was invited to visit WRI's Champaign headquarters to speak about his website. Stephen Wolfram is both the President and CEO of WRI. WRI publishes and creates technical software and has a user base of over one million. Approximately 90% of its revenues are generated by its Mathematica software,[3] a sophisticated mathematics software application. Many members of WRI's staff were aware of Weisstein's Encyclopedia and recognized its value as a resource. As a result, WRI recruited Weisstein for employment which he accepted on June 1, 1999. Throughout this time period, WRI had been discussing the possibility of developing products with CRC. In an email dated May 6, 1999, from Allan Wylde, who was then acting as WRI's publishing consultant, to Stern of CRC, Wylde described the Encyclopedia as the "top priority" for possible joint ventures. Weisstein continued to maintain his website in some form throughout these discussions under a domain name he had purchased and began hosting his web pages on a commercial Internet-hosting site.

---

2. CRC contends that placement of this copyright statement was erroneous.

3. WRI's website describes Mathematica as follows:

From simple calculator operations to large-scale programming and interactive document preparation, Mathematica is the tool of choice at the frontiers of scientific research, in engineering analysis and modeling, in technical education from high school to graduate school, and wherever quantitative methods are used.

On June 14, 1999, representatives of WRI and CRC met to discuss possible joint ventures based on six of CRC's existing publications. No agreements were reached at this meeting. A proposal was later sent by WRI to CRC regarding placement of Weisstein's Encyclopedia on the *www.wolfram.com* website. WRI proposed waiting three months before placing the Encyclopedia on the website to accommodate CRC's concerns of lost sales. WRI further offered to place advertisements for CRC's products online. In response to the proposal, CRC stated via email that "[t]here is a great deal of concern here about allowing Wolfram to put the entire Weisstein Encyclopedia on the Web without providing [CRC] with some hard compensation." Following this communication, negotiations ceased.

From June through November, 1999, Weisstein worked with WRI on improving the graphical design of the web-based Encyclopedia and adding a subject classification. The new design was completed in December, 1999, and the name of Weisstein's site was changed from Treasure Trove to "Eric Weisstein's World of Mathematics" (MathWorld). The site was moved at that time to a WRI-owned computer at the Internet address of *www.mathworld.wolfram.com*. On approximately February 15, 2000, Stern received a phone call from Kenneth Rosen, a CRC employee in the mathematics area, informing Stern that Rosen had found the Encyclopedia on the Mathematica website. Upon viewing the website, Stern observed that the opening page contained the announcement: "Presenting MathWorld—Wolfram Research teams with Eric Weisstein to develop the web's most extensive mathematical resource."

CRC then conducted research on the similarity between the Encyclopedia and MathWorld. The following figures were presented in Stern's affidavit: (1) "Out of 515 entries, we found that 509 of those entries appeared in MathWorld;" (2) "Of the 509 Encyclopedia entries that appeared in MathWorld, we found that 335, or 65%, contained the same text and figures verbatim, with no alterations, however trivial. Only 174 entries or 33% of the entries copied contained editing in the text or figures, in many cases of trivial degree;" (3) "One of the useful features of the Encyclopedia is that it gives bibliographic references to other sources for many of its entries. In almost all cases, references that appeared in the Encyclopedia were carried over into MathWorld, with references being added in MathWorld in some cases." Because Wolfram refused to remove MathWorld from its website, CRC then instituted this action in the United States District Court for the Southern District of Florida. Upon motion of Defendants, it has been transferred to the Central District of Illinois.

## II. ANALYSIS

### A. Standard

■ To obtain a preliminary injunction based upon a claim of copyright infringement, Plaintiff must demonstrate: "(1) some likelihood of prevailing on the merits, and (2) an inadequate legal remedy at law and irreparable harm if preliminary relief is denied." *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir.1994). If Plaintiff clears these two hurdles, the court must consider "(3) the irreparable harm the nonmovant will suffer if preliminary relief is granted, balanced against the irreparable harm to the movant if relief is denied; and (4) the public interest, meaning the effect that granting or denying the injunction will have on nonparties." *Erickson*, 13 F.3d at 1067.

## B. Likelihood of Success on the Merits

### 1. Likelihood of Success Under Copyright Law

 The central issue in this case is whether Plaintiff is likely to succeed on the merits. To prove a valid claim of copyright infringement, Plaintiff must demonstrate: (1) "the ownership of a valid copyright;" and (2) "copying of constituent elements of the work that are original." *Harris Custom Builders, Inc., v. Hoffmeyer*, 92 F.3d 517, 519 (7th Cir.1996), *cert. denied*, 519 U.S. 1114, 117 S.Ct. 956, 136 L.Ed.2d 842 (1997). Plaintiff has submitted a Certificate of Copyright Registration. Pursuant to 17 U.S.C. § 410(c), this is prima facie evidence of the validity of the copyright.[4] The second element of copying can be divided into two subissues: (1) "whether the alleged copier had access to the work that he is claimed to have copied;" and (2) whether the copied work is substantially similar to the copyrighted work. *Ty, Inc., v. GMA Accessories, Inc.*, 132 F.3d 1167, 1169–70 (7th Cir.1997). *See also Atari, Inc. v. North American Philips Consumer Elec. Corp.*, 672 F.2d 607, 614 (7th Cir.1982), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982) (superseded by statute on other grounds).

 There is no question as to access in this case. Weisstein, the author of the Encyclopedia, has been an employee of WRI since June 1, 1999. He clearly had access to a work which was of his own creation. Furthermore, there is no dispute as to the similarity between the content of the Encyclopedia and the content of MathWorld. According to Stern's affidavit, ninety-nine percent of the 515 entries examined by CRC in the Encyclopedia appeared in MathWorld. Sixty-five percent of these entries contained identical text and figures. Furthermore, only eighteen percent of entries for the three letters of the alphabet checked by CRC were new. This is a sufficient amount of similarity to establish infringement. *Cf. Montgomery v. Noga*, 168 F.3d 1282, 1292 (11th Cir. 1999) (finding that copying a work which "incorporated over seventy percent of the original" which was protected by copyright was sufficient to constitute infringement).

Plaintiff further contends that Defendants' infringement has violated Plaintiff's exclusive rights in the copyrighted work as set out in 17 U.S.C. § 106. Initially, Plaintiff claims Defendants violated 17 U.S.C. § 106(2) by creating a derivative work based upon the copyrighted work. A derivative work is defined as "a work, based upon one or more preexisting works.... A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a derivative work." 17 U.S.C. § 101. In addition, Plaintiff argues that Defendants violated § 106(3) which gives copyright holders the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending." 17 U.S.C. § 106(3). Plaintiff argues this violation arose as a result of WRI's maintenance of Math World on its website which allows the electronic transmission of copyrighted material to anyone who visits the Mathematica website.

In its response, Defendants do not argue that the posting of Math World on WRI's website would not constitute copyright in-

---

4. 17 U.S.C. § 410(c) states that "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and the facts stated in the certificate."

fringement if Plaintiff has a valid copyright in the content of Math World. Rather, Defendants contend that Weisstein never transferred his rights in the Treasure Trove/Math World website in the Author Agreement he entered into with CRC. Defendants contend that the Encyclopedia was merely a derivative work of this senior work, and it is only the rights to the derivative work which Weisstein transferred to CRC via the Author Agreement. On this point, 17 U.S.C. § 103(b) provides:

> The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

Thus, if Weisstein transferred only his rights in the Encyclopedia as a derivative work of Treasure Trove, CRC has no valid claim of copyright infringement.

### 2. Likelihood of Success Under Contract Law

To determine the extent of the rights transferred by Weisstein, the court must examine the Author Agreement. The Author Agreement specifies and the parties agree that the law of Florida controls issues of contract interpretation. In construing the contract language, "[i]t is well settled that the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls." *Rose v. M/V "Gulf Stream Falcon"*, 186 F.3d 1345, 1350 (11th Cir.1999) (citing *Green v. Life & Health of Am.*, 704 So.2d 1386, 1391 (Fla.1998)).

The contract contained the following language with regard to copyright of the Encyclopedia:

> The Author hereby expressly grants, transfers, and assigns to the Publisher full and exclusive rights to the Work, including, without limitation, the copyright in the Work, all revisions thereof, and the right to prepare translations and other derivative works based upon the Work in all forms and languages for the full term of the copyright, and/or renewals and extensions thereof, throughout the world. The Publisher's exclusive rights include, without limitation, the right to reproduce, publish, sell and distribute copies of the Work, selections therefrom and translations and other derivative Works based upon the Work, in print, audiovisual, electronic, or by any and all media now or hereafter known or devised, and the right to license or authorize others to do any or all of the foregoing throughout the World.

The Work was defined as follows:

> The Work shall consist of approximately 1400 camera-ready manuscript pages and include approximately 1200 camera-ready illustrations to yield a completed work of approximately 1408 printed pages. In addition to the camera-ready copy, the Author will submit to the Publisher an electronic version of the text and a paper copy for Publisher's review, prepared in accordance with the Publisher's Instruction Guide for Authors, a copy of which will be delivered to the Author.

Finally, the contract contained a merger clause which stated:

> This Agreement is the entire agreement between the parties relating to the Work. It supersedes all previous oral or written representations or agreements relating to the Work and may not be

modified or amended, nor may any of its terms or provisions be waived, except by a written instrument executed by the party affected by such modification, amendment, or waiver.

Plaintiff and Defendants argue that the contract language is unambiguous. Defendants argue that "the plain language of the Author Agreement ... makes clear that CRC's rights are limited to the derivative Concise Encyclopedia (and derivatives such as translations or static electronic images of the printed book pages), but do not include rights in the senior work, Treasure Trove/Math World." Plaintiff focuses on the use of the words "full and exclusive rights" which CRC is granted in derivative works "in print, audio-visual, electronic, or by any and all media now or hereafter known or devised" to demonstrate that the transfer was not limited to the right to book publication only.

This court finds in examining the language of the Author Agreement, particularly the definition of Work, it is open to interpretation whether Weisstein was handing over his rights to Treasure Trove/Math World. There is no clear indication that CRC's rights were limited to the derivative Encyclopedia because there is no language concerning either CRC's or Weisstein's rights pertaining to the website. Plaintiff's argument that the "full and exclusive rights" language removes ambiguity is unconvincing. It is entirely feasible for one to read the contract and assume this language refers only to the Encyclopedia due to the vague definition of Work. Furthermore, including electronic media in the channels through which CRC has rights to derivative works does not remove the ambiguity. If the definition of Work is understood to exclude Weisstein's website, the contract could only be read to mean CRC had rights only in those derivative works which originate from the Encyclopedia.

◼ When there is ambiguity in the terms of a contract, the court must resolve that ambiguity in accordance with the intent of the parties. *See Dune I, Inc. v. Palms N. Owners Ass'n,* 605 So.2d 903, 905 (Fla.Dist.Ct.App.1992). "It is a well-established legal principle that if a written contract is ambiguous so that the intent of the parties cannot be understood from an inspection of the instrument, extrinsic or parol evidence of the subject matter of the contract, of the relation of the parties, and of the circumstances surrounding them when they entered into the contract may be received in order to properly interpret the instrument." *Danforth Orthopedic Brace & Limb. Inc., v. Florida Health Care Plan, Inc.,* 750 So.2d 774, 776 (Fla. Dist.Ct.App.2000) (quoting *Lemon v. Aspen Emerald Lakes Assocs., Ltd.,* 446 So.2d 177 (Fla.Dist.Ct.App.1984)).

Defendants point to several circumstances to support their proposition that the parties intended to exclude the Treasure Trove/Math World website from the definition of Work in the Author Agreement. Initially, Defendants contend that Weisstein would not have signed the Author Agreement if the contract would have limited his ability to control the website in the future. Weisstein stated in his affidavit:

I have worked innumerable 70+ hour weeks in order to continue developing my website into the world's best mathematics resource. The site existed for years before CRC ever knew it, or I existed. No one from CRC ever lifted a finger to help me develop the website ... I never believed that CRC had any proprietary claim to my website, and CRC led me to believe that it had no intention of asserting any such claim.

The website is, and always has been, mine and mine alone.

Defendants further argue that Weisstein "consistently expressed desire to control the future of Treasure Trove/Math World." Defendants contend this is evidenced by an email sent from Weisstein to Susan Ann Potter, a literary agent Weisstein considered hiring to represent him in negotiations with CRC, which stated: "I believe that continuing to maintain a publicly available website is useful. In fact, it may even serve as a useful marketing strategy. For instance, I have already received about 50 inquiries from people wishing to purchase a published copy."

Defendants further argue that the course of dealing between Plaintiff and Weisstein evidenced that Weisstein never lost control of the website. In support of this proposition, Defendants indicate that Weisstein was the person who determined to what degree the website would be available to users throughout the time period in question because he determined which computers would host the website and determined what security measures would be employed to prevent copying of the Treasure Trove/Math World site by users. They further point to the second contract signed by Weisstein for licensing of the CD–ROM version. Defendants contend that this second contract would not have been necessary if Weisstein had transferred his rights to the website in the initial Author Agreement.

Finally, Defendants contend that Internet publishing practices demonstrate the parties' intent to exclude the website from the definition of Work in the Author Agreement. Defendants admit "there may be no trade usage per se bearing upon the scope of the rights Dr. Weisstein assigned to CRC in the Author Agreement." However, Defendants submitted the affidavit of Theodore Gray, a member of the Executive Committee at WRI. Mr. Gray stated in his affidavit that "CRC knew or should have known the difference between [Weisstein's] dynamic, collaborative, evolving website—which preceded the book, made it possible, and has evolved further since its publication—and a website which merely reproduces [static images of] a traditionally created and published book." Further, Defendants argue that the ambiguity in the contract should be construed against CRC because it drafted the contract. *See Allapattah Serv. v. Exxon Corp.*, 61 F.Supp.2d 1308, 1320 n. 20 (S.D.Fla.1999) ("[I]t is a basic tenet of contract law, especially in the context of adhesion contracts, that ambiguities be interpreted against the party that drafted the contract.")

These arguments are unconvincing, however, when viewed in light of all of the circumstances surrounding the formation of the contract. Weisstein's email to Susan Potter has little relevance as it merely indicates a wish on Weisstein's part expressed to an agent who did not represent Weisstein in his negotiations with CRC. Weisstein's control over the security measures imposed on the website as well as his control over the computer which hosted the website is equally unpersuasive. Simply because CRC allowed Weisstein personally to block portions of the website does not negate the fact that Weisstein blocked these portions at the direction of CRC. Neither does the CD–ROM contract diminish Plaintiff's position. Weisstein was entitled to additional compensation for doing additional work for CRC in the formation of the CD–ROM adaptation which necessitated, at least in part, the second contract. For example, "the CD–ROM required, and Dr. Weisstein was able to provide, links and cross-references between the various entries in the Encyclopedia." Finally, the statements made by Mr. Gray concerning his impressions about what

CRC should have realized shed little light on what Weisstein and CRC intended.

Furthermore, Weisstein's statements about his intent when entering into the contract do not align with the circumstances existing prior to and after the contract was signed. Most significant among those circumstances is the fact that Weisstein sent the following email to Plaintiff before he was hired by WRI: "I have been getting lots of requests from people who would like to access the full web version of my encyclopedia, which currently has many portions blocked at CRC's request. Is there any mechanism for CRC to license the web version (for a fee)?" This language clearly indicates that Weisstein was aware he no longer had control over his website. Further, Weisstein continued to keep portions of his Treasure Trove website blocked at the request of CRC despite his desire to accede to the wishes of internet users and once again return the website to its complete form.

Further supporting Plaintiff's position, Weisstein clearly reviewed the contract upon receiving it because he requested a greater percentage of royalties on derivative works. Weisstein could have easily requested an addendum to the contract which excluded the website from the Author Agreement when he negotiated a change in the amount of royalty, but there is no evidence that he did so. Finally, there are the discussions between CRC and WRI about the potential for a joint venture on Weisstein's work. Plaintiff has submitted an email sent from WRI to CRC which stated that Weisstein's Encyclopedia was its "top priority" for discussion. Weisstein had been employed by WRI for two weeks at the time negotiations between WRI and CRC took place. At that time, WRI had access to the Author Agreement signed by Weisstein. If WRI truly believed that CRC had no rights to the web version of the Encyclopedia, there would be no reason to negotiate for the rights with CRC.

■ Copyright law further supports Plaintiff's position. Defendants state in their pleadings that the Treasure Trove/MathWorld website is "an HTML version of the [Encyclopedia] manuscript" and the Encyclopedia is a "snapshot" of the website as it then existed. This language does not align with Defendants' argument that Weisstein was signing over his rights to a derivative work in the Author Agreement. "[A] derivative work must be substantially different from the underlying work to be copyrightable." *Gracen v. Bradford Exch.*, 698 F.2d 300, 305 (7th Cir.1983). *See also Sherry Mfg. Co., v. Towel King of Florida, Inc.*, 753 F.2d 1565, 1568 (11th Cir.1985) (stating a derivative work must "contain some substantial, and not merely trivial, originality"). Changing the medium in which a copyrightable work is displayed is not a sufficient change to give rise to a derivative work. In *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486 (2nd Cir.1976), *cert. denied*, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976), the court found that a plastic Uncle Sam bank created with only minor variation from a metal version of the bank was not sufficient variation to deserve copyright protection. The court found "there were no elements of difference that amounted to significant alteration or that had any purpose other than the functional one of making a more suitable ... figure in the plastic medium." *Snyder*, 536 F.2d at 489. The court went on to state that "the mere reproduction of a work of art in a different medium should not constitute the required originality for the reason that no one can claim to have independently evolved any particular medium." *Snyder*, 536 F.2d at 491 (quoting 1 M. NIMMER, THE LAW OF COPYRIGHT § 20.2

at 94 (1975)). By moving the content of the website to the Encyclopedia, therefore, Plaintiff could not have created a copyrightable derivative work. In essence, the Author Agreement would have conveyed no copyright rights to Plaintiff in Weisstein's work. It is difficult to believe that CRC would enter into such a contract. For all of the above reasons, the court finds that Plaintiff has a high likelihood of succeeding on the merits.

## C. Irreparable Harm, Balancing of Hardships, and Public Interest

■ "Once likelihood of success on the merits is shown, irreparable harm is presumed to exist when copyright or trademark is infringed." *Ty, Inc. v. Publications Int'l, Ltd.*, 81 F.Supp.2d 899, 903 (N.D.Ill.2000). Furthermore, Plaintiff can establish irreparable harm in fact because WRI has placed MathWorld on its Mathematica website which provides easy access to the content of the Encyclopedia for free to anyone with internet capabilities. As discussed above, MathWorld contains much of the same content as the Encyclopedia. It is reasonable to assume CRC could suffer lost sales as a result of MathWorld's presence on Mathematica, particularly for its CD–ROM version of the Encyclopedia. *See On/TV of Chicago v. Julien*, 763 F.2d 839 (7th Cir.1985) (lost profits considered irreparable harm). Thus, Plaintiff has established irreparable harm.

WRI has not pointed to any harm it will suffer as a result of this court granting a preliminary injunction. Rather, WRI states that it "enjoys no profits from sponsoring Dr. Weisstein's website" and "sponsors the site pro bono publico and does so at considerable cost." Furthermore, the harm that might befall Weisstein is not significant compared to the potential harm to CRC. Defendants argue that Weisstein left his position at the University of Virgi-

nia to work full time on the MathWorld website, his life work. However, Mr. Gray indicated in his affidavit that Weisstein has other duties at WRI other than maintenance of the MathWorld site. Furthermore, Stern indicated in his affidavit that Weisstein had informed him that Weisstein was working on several projects for WRI, including the development of an encyclopedia of physics. The potential harm to CRC is much more significant.

■ Finally, a preliminary injunction serves the public interest in maintaining the integrity of copyright law. *See Igram v. Page*, 1999 WL 705895, *2 (N.D.Ill.). Defendants contend that the public interest would be disserved by the issuance of a preliminary injunction because those who access MathWorld via the Mathematica website will be losing a valuable resource. However, the vast majority of the content of the Encyclopedia is still available through CRC in both the Encyclopedia and CD–ROM. The public's interest in free access to this information does not outweigh the public's interest in maintaining the integrity of copyright law.

## D. Other Motions

Defendant Stephen Wolfram has filed a Motion to Dismiss Complaint for Lack of Personal Jurisdiction asserting that he does not have sufficient contacts with the state of Florida to satisfy the requirements of the Due Process clause. Because the case has been transferred to the Central District of Illinois, this matter is no longer in issue. Defendants also filed a Motion to Defer Ruling on the Motion for Preliminary Injunction until the court addressed the Motion to Transfer to the Central District of Illinois. Again, because the case has already been transferred to the Central District of Illinois, this matter is moot.

## III. CONCLUSION

IT IS THEREFORE ORDERED:

(1) Plaintiff's Motion for Preliminary Injunction (# 13) is GRANTED. Defendants are hereby ordered to immediately remove "Eric Weisstein's World of Mathematics" from the Mathematica website pending a full trial on the merits.

(2) Defendant Wolfram's Motion to Dismiss Complaint for Lack of Personal Jurisdiction (# 30) is denied as MOOT.

(3) Defendants' Motion to Defer Ruling on the Motion for Preliminary Injunction (# 45) is denied as MOOT.

(4) This case is referred to the Magistrate Judge for further proceedings.